[Crim. Nos. 7018, 7167. Second Dist., Div. Two. Dec. 5, 1960.]

THE PEOPLE, Respondent, v. MANUEL GARCIA, JR., Appellant.

(Two Cases.)

Claude Vibart Worrell for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Respondent.

FOX, P. J.—Defendant has appealed from the judgment of conviction on Counts II and III of the information and from his later conviction on Count I. He has also appealed from the orders denying his motions for a new trial.

In Count I appellant and four others were charged with a conspiracy under section 182, subdivision 1, of the Penal Code to violate section 11500 of the Health and Safety Code. In Count II these same persons were charged with possession of heroin, and in Count III appellant alone was charged with violation of section 12021 of the Penal Code (Dangerous Weapons Control Law). Appellant was also charged with three prior convictions, which he admitted. Appellant was found guilty on Counts II and III but the jury failed to reach a verdict on the conspiracy charge. He was later retried on the conspiracy count and found guilty. He was sentenced to the state prison, the sentences to run concurrently.

In view of appellant's contentions that the narcotics evidence was illegally obtained and that the evidence is insufficient to sustain his conviction on any of the charges, it is necessary to delineate the evidence in considerable detail leading up to his arrest and the discovery of heroin and the firearms.

Edward J. Sanchez, a Los Angeles police officer, placed appellant under arrest along with codefendants Rodriguez and Mary Ventura on February 16, 1959. Prior to these arrests the officer had accumulated considerable information concerning appellant and his activities. The first information he had was received from Officer McCarville on July 25, 1958. It was to the effect that Bobby Luera and Sara Cruz had been arrested for the possession of 12 ounces of heroin.

They told Officer McCarville that the heroin belonged to a person known as Manuel or "Boxie." Sanchez then went to the county jail where he talked to Miss Cruz; she told him that Manuel or Boxie owned the narcotics; that he lived around the 3700 block on East Third Street in East Los Angeles, but that she did not know his full name. Sanchez first ascertained appellant's name by checking the "monicker" file in the police records bureau; he learned that the name "Boxie" was associated with Manuel Garcia, Jr. Officer McCarville later informed Sanchez that he had had a conversation with a person by the name of Lalo Gandera; that this person had told him that he had been a runner in narcotics for Manuel or Boxie. Gandera explained to the police the method by which he contacted appellant, viz., by calling a certain telephone number and asking for Mary Ventura, appellant's sister, who would put him in touch with appellant. Gandera gave this number to the officer, who called the number but was not able to locate the sister in that way. He then went to the vicinity of the 3700 block on East Third Street and ascertained that the sister and her family had moved; the neighbors did not know her address.

In December, Officer Sanchez received a telephone call from a person who did not identify himself, but the officer recognized his voice as that of Lalo Gandera. He asked the officer if he still wanted to get in touch with Manuel or Boxie. The officer said "Yes." Whereupon Gandera gave him a telephone number and told him that it was the number of Mary Ventura, appellant's sister. Sanchez called the number, which was answered by a female voice. He asked for Mary, and the voice responded, "This is her, what do you want?" Sanchez said, "This is Lalo." He told her that he wanted to get hold of Manuel to pick up an ounce of stuff. She asked for his telephone number, which the officer gave. About a minute and a half later the telephone rang and a male voice greeted the policeman. Officer Sanchez said, "This is Lalo." The voice replied, "You are not Lalo" and hung up.

Early in January 1959, Sanchez made a second call to the telephone number that Gandera had given him. A female voice answered, "This is Mary. What do you want?" Sanchez said he wanted Manuel so he could get five grams of narcotics. He told her where he was, and she stated, "I'll be right down." No one came, however. The officer later had an opportunity to talk to appellant and his sister, Mary Ventura, and then recognized their voices as being those of

the persons to whom he had talked on the above mentioned occasions.

On November 25, 1958, Officer Sanchez had a conversation with Raymond Acuna, who said that he had handled narcotics for appellant in the past; he stated that the narcotics he got from appellant were peculiar in that they made his arm numb. The officer explained that this effect was produced by the narcotic having been cut with novocain. The officer inquired of Acuna as to the manner in which the narcotic transaction had been handled. Acuna said that appellant would come to his house at night and pick up the money and then the next day a runner would bring the narcotics to him. The narcotic always came packaged in rubber containers. Acuna and Gandera told the officers that they received $100 a week plus all the narcotics they could use, for their services as runners.

Sanchez looked up appellant's record and discovered that he had been convicted of violating the laws relating to narcotics. Sanchez also spoke to Policeman Joe Aguirre, who said that he had bought heroin from appellant a few years ago, and that he had been sent to the state prison for that offense.

The officers observed a meeting between appellant and a person named Edward Vega Casto. Various narcotic addicts had told the police that he was a dealer for appellant. During the course of their conversation, the officers observed something change hands.

At about this time Officer Sanchez spoke to one Martin Mendoza, whom he had known for years. Mendoza informed him that appellant drove a white 1958 Thunderbird, and was called "T Bird Boxie." The officer had received reliable information from Mendoza on a prior occasion.

Early in February, Sanchez and Officer McCarville went to the Monterey Park Police Department when investigating a narcotic dealer by the name of Ira Leonard Lamb. The Los Angeles Police had, on several occasions, arrested Lamb on charges of narcotic possession. The Monterey Park Police showed them a list of license numbers that frequented Lamb's residence. One of the numbers was RFS-347, which was registered to appellant's sister and used by him. Sanchez checked the records for purchases of new homes in the Montebello area under appellant's name. He found that a recent purchase had been made of the property at 2425 Via Camille by appellant and Frances Garcia. At this address the officers

saw a 1958 Thunderbird in the driveway, bearing license number RFS-347. A check with the Department of Motor Vehicles disclosed that the car was registered to Mary Ventura, appellant's sister.

At approximately 2 p.m. on February 16th, the day of the arrest, Philip Rodriguez arrived at 2425 Via Camille, in Los Angeles, with a woman and a small child. About half an hour later he left alone and drove to a drug store. Officers Sanchez and McCarville followed him. He came out of the drug store in a few minutes carrying a package. Officer McCarville went inside and spoke to the druggist, who informed him that Rodriguez had just purchased three dozen prophylactics and a can of milk sugar. Sanchez followed Rodriguez back to the house on Via Camille. Prophylactics are commonly used to package heroin, and milk sugar is used to cut it. Rodriguez, with his wife and child, left the house about 4:45. The police followed and had him pull over to the curb. In his conversation with the police, Rodriguez said he knew no one living on Via Camille. The officers asked what he did with the purchase he had made at the drug store. Rodriguez said he knew nothing about any purchase; that they must have the wrong person. A search of his car was nonproductive. Sanchez told him they had seen him make the purchase. Rodriguez then said he probably left them in the house. The occupants of the Rodriguez car were left with another policeman; Sanchez and McCarville returned to the Via Camille address. McCarville went to the rear of the house while Sanchez approached the front. He knocked on the door and a female voice said. ''Who is this?'' Sanchez replied, ''Police officers, open the door.'' The female voice said, ''No, I won't.'' He also overheard the woman say, ''Quick, let's get out of here,'' and he heard what seemed to be someone running through the house. He forced the front door open and ran to the bathroom. In the center of a cocktail table in the living room there was a blue milk sugar can; he looked into it and saw a quantity of rubber containers tied with knots, each having a portion of whitish powder in it. At approximately this time, Rodriguez and his wife, as well as appellant and Edith Diaz, were brought in by other officers. The police proceeded to search the house. In the rear bedroom closet were found several jars containing a whitish powder; a pharmacist's mixing bowl, and 18 prophylactics, all in a brown satchel with another can of milk sugar. The whitish powder proved to be heroin. The narcotics were valued at $25,000. Appellant

stated that he knew nothing about this narcotic paraphernalia; that possibly someone else had left it there. A police fingerprint expert compared appellant's fingerprints with prints that he lifted from the narcotic paraphernalia in the satchel. He formed the opinion that the fingerprints were those of appellant. During the search the officers discovered five pistols, loaded, two rifles, and over a thousand dollars in currency. One of the rifles was equipped with a telescopic sight. On a night stand was an automatic pistol having a barrel less than 12 inches in length and capable of being concealed on the person. The bedroom in which the automatic was found was appellant's. He disclaimed any knowledge, however, of it. At an interrogation that evening at the police station, Rodriguez admitted having purchased the prophylactics and milk sugar. The appellant stated that he had lived there three or four months, that his mother owned the house, and that he paid rent to her.

Appellant testified in his own behalf. He stated that he sent Rodriguez to buy some Pream (powdered milk) and some prophylactics. He denied knowing anything about the narcotics, or the guns, being in the house. Martin Mendoza, Sara Cruz, and Robert Luera denied that they had given the police any information concerning appellant's activities. Appellant's sister, Mary Ventura, denied any knowledge or complicity in connection with any of these charges. She did say, however, that she had taken several telephone calls from different people for appellant, but she could not recall having received calls which the police claimed they had made to her. She stated that her brother did not want anyone to know his telephone number, and that was why she took and relayed the messages to him.

Rodriguez, testifying on appellant's behalf, stated that he bought the prophylactics for his own use, and the milk sugar because it was the only can left on the shelf. He explained his failure to tell the police, when initially accosted by them about purchasing these items, was because he was scared.

Defendant's first contention is that there was no probable cause for his arrest, and that the search and seizure of evidence without a warrant was illegal. We find no merit in this argument.

"Probable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused." (*Bompensiero* v. *Superior Court*, 44 Cal.2d 178, 183 [281 P.2d

250].) It should also be noted that the weight to be accorded the information upon which the arresting officers acted in making the arrest and search was initially for the trial court's determination in the exercise of a sound discretion. (*Lorenzen* v. *Superior Court,* 150 Cal.App.2d 506, 510 [310 P.2d 180]; *People* v. *Gonzales,* 141 Cal.App.2d 604, 607 [297 P.2d 50]; *People* v. *Arter,* 169 Cal.App.2d 439, 443 [337 P.2d 534].)

Applying these principles to the factual picture disclosed herein, it is clear there is adequate support for the trial court's ruling that the arrest and search were legal and that the evidence in question was legally obtained and therefore admissible.

 The officers had several sources of information all to the same basic effect, namely, that appellant was dealing in narcotics. Such was the story of Bobby Luera and Sara Cruz. The stories of Lalo Gandera and Raymond Acuna were of like character. These were from wholly independent sources. The picture thus disclosed is strikingly similar to that revealed in *People* v. *Taylor,* 176 Cal.App.2d 46, where, at page 51 [1 Cal.Rptr. 86], this court made the following statement: "This information came not from a single source but from numerous individuals, separately. One may with reason discount a story brought to him by a single individual. He may continue to view the story with suspicion when a second person relates it to him. But when he gets the same information from a number of independent sources—that a certain man is selling narcotics—he is entitled to attach some degree of reliability to it. It may be that the story is untrue. But it is also possible that a so-called reliable informant is not telling the truth, or that his information is incorrect." In addition, the officers were aware of appellant's extensive criminal record, much of it in narcotics. The police were entitled to take this into account for "In determining whether there is reasonable cause . . . a peace officer may take into account the past conduct, character and reputation of the person suspected." (*People* v. *Wickliff,* 144 Cal.App.2d 207, 212 [300 P.2d 749].) Furthermore, surveillance of appellant disclosed his association with narcotic dealers and users. These were circumstances the officers were entitled to take into consideration. (*People* v. *Hollins,* 173 Cal.App.2d 88, 93 [343 P.2d 174].) Moreover, the police observed a person going to a drug store from appellant's home and buying two items, both of which are commonly used together in the narcotic traffic. It was reasonable

for them to infer not only that the purchase related appellant to narcotic activities but also that narcotics were probably in his possession, and the items would be used to prepare the contraband for distribution.

From the foregoing it is obvious that ''probable cause'' for appellant's arrest was established. It was therefore unnecessary for the police officers to have a warrant for his arrest. (*People* v. *Williams,* 174 Cal.App.2d 175, 179-180 [344 P.2d 45].)

The refusal to open the door upon the officers' demand, and the noise and the comment from within indicating that the occupants were attempting to flee the premises, were ample reasons for forcing entry. (*People* v. *Williams,* 175 Cal.App.2d 774 [1 Cal.Rptr. 44]; *People* v. *Barnett,* 156 Cal. App.2d 803, 807 [320 P.2d 128].)

There is no merit in appellant's argument that the evidence is insufficient to sustain his conviction on the charge of possession. The contraband was discovered in his home and his fingerprints were found on the narcotic paraphernalia that was in the brown satchel, which also contained several jars of heroin. From this evidence the jury could reasonably infer that the defendant had possession of the contraband. (See *People* v. *Crews,* 110 Cal.App.2d 218 [242 P.2d 64]; *People* v. *Rodriguez,* 175 Cal.App.2d 56 [345 P.2d 330].) Defendant sought to explain the presence of his fingerprints on the narcotic paraphernalia by saying that the officers handed to him the items on which the fingerprints were found. The officers denied this testimony. The trial court has resolved this conflict against appellant and such resolution is binding on appeal.

There is likewise no merit on appellant's claim that the evidence is insufficient to sustain his conviction on Count III, violation of the Dangerous Weapons Control Law.* The evidence shows that the gun was found in appellant's bedroom on a night stand. The gun was fully loaded. From this evidence the jury could reasonably infer that appellant owned the gun, or had it in his possession or under his custody or control. The gun was capable of being concealed upon the person, and appellant had been previously convicted of a

---

*The pertinent portions of Penal Code, section 12021, provide: ''**Any** person . . . who has been convicted of a felony under the laws of . . . the State of California . . . who owns or has in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person is guilty of a public offense. . . .''

felony. Thus all the elements of crime charged in this count are established. Although appellant denied any knowledge of the gun, and Mrs. Diaz, who lived in the home and was originally a defendant, claimed the gun was hers, the jury was not required to give full credence to this testimony. (*People* v. *Carr*, 170 Cal.App.2d 181, 186-187 [338 P.2d 479].)

Defendant contends that the evidence is insufficient to support his conviction on the conspiracy count. We do not find this contention meritorious. ▆▆ "The gist of a criminal conspiracy is a corrupt agreement of two or more persons to commit an offense prohibited by statute, accompanied by some overt act in furtherance of the objects of the agreement. [Citations.] ▆▆ The existence of the conspiracy may be established by circumstantial evidence. [Citation.] ▆▆ The agreement may be inferred from the acts and conduct of the defendants in mutually carrying out a common purpose in violation of the statute. [Citations.] ▆▆ It is not necessary that the overt acts be criminal. [Citation.] If such acts are done as a step toward the furtherance of the conspiracy they are sufficient. [Citation.] ▆▆ Also the overt act may be performed by any one of the conspirators and yet be sufficient, for the members of the conspiracy are bound by all acts of all members done in furtherance of the agreed plot. [Citations.]'' (*People* v. *Frankfort*, 114 Cal. App.2d 680, 688-689 [251 P.2d 401].) ▆▆ We have already held that the evidence sufficiently establishes that appellant had possession of the contraband in question. A significant circumstance in the instant case is the actual possession by appellant of an extremely large quantity of heroin. A lone peddler would ordinarily not deal in such volume. The very amount of the contraband here involved points toward an established system for distribution, which reasonably would entail the services of more than one person. That several persons were involved with appellant was indicated by the testimony of defendant Rodriguez, who purchased, at a drug store, milk sugar and several dozen prophylactics, two items that are widely used in packaging and distributing heroin. It might be contended that Rodriguez was an innocent dupe and that he was merely sent on an errand without knowledge of its significance, but other evidence militates against such a hypothesis. Rodriguez denied at first having made the purchases at all. He denied knowing the appellant or having just been at his home. After having admitted making the purchases he insisted that he bought the items for

his personal use. Such deception and falsehood are evidence of a consciousness of guilt. (*People* v. *Stanley,* 162 Cal.App. 2d 416, 420 [327 P.2d 973].) From Rodriguez' efforts to evade the truth the jury might have reasonably concluded that he was fully aware of the nature of the trip to the drug store and that he had an agreed role in trafficking in the narcotics.

Then there were the telephone calls through appellant's sister, and appellant's evasion of the receipt of such calls. What was said over the telephone by appellant and his sister indicated a clear comprehension of the request for a narcotic and an implied admission that they were engaged in such traffic. All the foregoing acts were in furtherance of the conspiracy and were sufficiently established by the evidence. Measured by the principles stated above governing the existence and furtherance of a conspiracy, it is clear that the evidence amply sustains the jury's finding of guilt on the conspiracy count.

▪▪▪▪ Appellant's final contention is that he was convicted twice for the same act, that is, for possession of heroin and conspiracy to violate section 11500 of the Health and Safety Code. From this, he argues that his conviction on the conspiracy charge in the second trial cannot stand. His position is not well founded.

Two separate offenses were charged. The conspiracy count involved an illegal agreement to violate the law with respect to the possession of narcotics, which agreement was followed by overt acts in furtherance thereof. The possession count dealt solely with the actual possession of a narcotic. Conspiracy is a distinct offense from the commission of the offense forming the object of the conspiracy. (*People* v. *Campbell,* 132 Cal.App.2d 262, 268 [281 P.2d 912].) It is independent of the commission of the charge itself. (*People* v. *Robinson,* 43 Cal.2d 132, 138 [271 P.2d 865].) The fact that the conspirators succeed in perpetrating their ultimately intended offense does not relieve them of responsibility for the conspiracy. (*People* v. *Keene,* 128 Cal.App.2d 520, 529 [275 P.2d 804].) In passing on the question here presented, the court in *People* v. *Hoyt,* 20 Cal.2d 306, pointed out, at page 317 [125 P.2d 29], that "The test is the identity of the offenses as distinguished from the identity of the transactions from which they arise." The court, in *People* v. *Severino,* 122 Cal.App.2d 172 [264 P.2d 656], applied this test (p. 184)

in a case very similar to the one at bar. Applying it to the instant case, it is clear that appellant was not convicted twice for the same act and that he was properly convicted on both counts.

The judgment and order are affirmed in each case.

Ashburn, J., and Herndon, J., concurred.