[Crim. No. 15652.    Second Dist., Div. One.    Apr. 23, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. SIDNEY RUSSELL NEESE, JR., Defendant and Appellant.

Albert D. Silverman, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and James H. Kline, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—Defendant was acquitted by a jury of robbery (count I) and kidnaping (count II) and convicted of a violation of section 12021, Penal Code (count III). The court found one of three alleged prior felony convictions to be true. Defendant appeals from the judgment.

Around 8:05 p.m. on February 26, 1968, Paul Krumhauer, who operates a restaurant in Pomona, was robbed of $80 by a man he four times identified as defendant who displayed a gun he identified as Exhibit 2 (.38 caliber revolver), and taken by defendant to a storeroom where he was ordered to remain. However, the jury, apparently accepting as true the testimony of defendant's alibi witnesses, acquitted him of both robbery and kidnaping.

In count III defendant was charged with and convicted of a violation of section 12021, Penal Code, in that on or about February 26, 1968, he had in his possession and under his custody and control a .38 caliber revolver capable of being concealed upon the person, he having been convicted of robbery, a felony, in 1963. Appellant urges a reversal on the ground that the trial court erred in allowing prior inconsistent statements of the People's witnesses to be admitted as substantive evidence and failing to instruct the jury to limit its consideration thereof to impeachment.

Mrs. Bostic, who lived in a common law relationship with defendant, was the main prosecution witness. She testified that she never saw defendant with the gun (Exh. 2) in his possession and particularly on February 26 she did not see him with it in his waistband; however she admitted she told Officer Allexy that she saw the weapon at one time in the waistband area of defendant's trousers but that it was not true, explaining she was angry, upset, drunk, vindictive and wanted defendant arrested. Officers Haney, Hower and Allexy testified that on February 27, 1968, Mrs. Bostic said that around 8:30 p.m. on February 26 defendant displayed the gun in the waistband area of his trousers. Mrs. Bostic's son Mark, a second prosecution witness, testified that he saw something brown in the waistband of defendant's trousers around 8:20 p.m. on February 26 but did not know if it was a gun; he admitted he told the officer it was a .38 snub-nosed special but explained he was "mad right then," the whole family was fighting and upset and defendant broke up the furniture. Officer Allexy testified that on February 27 Mark described the weapon to him as a .38 caliber snub-nosed revolver and said he had seen it in the waistband of defendant's trousers at 8:30 p.m. on February 26. Milan, Mrs. Bostic's daughter, a third prosecution witness, denied she saw defendant with the weapon at 8:30 p.m. on February 26, but admitted she told the officer she noticed a weapon to be located in the stomach area of defendant's body and explained she was angry and upset and knew that any connection with the gun would get defendant into trouble. Officer Allexy testified that on February 27 Milan told him that on the previous evening she had noticed a gun in the waistband area of defendant's trousers directly above the crotch.

The credibility of a witness may be attacked by evidence of "A statement made by him that is inconsistent with any part

238

of his testimony at the hearing'' (§ 780, subd. (h), Evid. Code) and by any party, including the party calling him (§ 785, Evid. Code) thus, the prosecutor's impeachment of his own witnesses was proper. However, after the three witnesses admitted making the prior inconsistent statements and were given the opportunity to and did explain their reasons for so doing (§ 770, Evid. Code), extrinsic evidence of the statements was offered by the testimony of Officers Haney, Hower and Allexy as proof of the truth of the matters therein asserted as provided in section 1235, Evidence Code, which abrogated the formerly well-established rule that a prior inconsistent statement of a witness is admissible only for the limited purpose of impeachment. Thus, at the time of trial (May 13-18, 1968) the prior inconsistent statements were properly admitted for all purposes. However, shortly thereafter (May 28, 1968) the Supreme Court in *People* v. *Johnson,* 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111], declared section 1235, Evidence Code, insofar as in a criminal case it authorizes the use of prior inconsistent statements as evidence of the truth of the matters asserted therein, to be unconstitutional as depriving an accused of his right of confrontation guaranteed by the Sixth Amendment to the United States Constitution. (Pp. 658-660.) *Johnson* returned California law in this area to the general common law rule which prevailed prior to the passage of the Evidence Code limiting admissions of prior inconsistent statements in criminal cases to impeachment purposes. (*People* v. *Green,* 70 Cal.2d 654, 659 [75 Cal.Rptr. 782, 451 P.2d 422]; *People* v. *Bradford,* 70 Cal.2d 333, 345 [74 Cal. Rptr. 726, 450 P.2d 46].) ■ The fact that at the trial defendant failed to object to the admissibility of the prior inconsistent statements as substantive evidence or request an instruction that the jury consider them for impeachment purposes only does not preclude him from raising the issue now. Indeed, in light of sections 770 and 1235, Evidence Code, there was no reason to object and defendant had no burden of anticipating unforeseen changes in the application of the statute. (*People* v. *Kitchens,* 46 Cal.2d 260, 262 [294 P.2d 17]; *People* v. *Vinson,* 268 Cal.App.2d 672, 675 [74 Cal.Rptr. 340]; *People* v. *Odom,* *(Cal.App.) 71 Cal.Rptr. 260.)

■ While the prior inconsistent statements fall within

*A hearing was granted by the Supreme Court on October 23, 1968. The opinion of that court is reported in 71 Cal.2d —— [78 Cal.Rptr. 873, 456 P.2d 145].

the ambit of *Johnson* and subsequent cases and without a limiting instruction were undoubtedly considered by the jury for all purposes, the error, although of federal constitutional dimensions and thus governed by the *Chapman*[1] test of prejudice, does not automatically deprive the accused of a fair trial, and the conviction will be reversed only in those cases in which prejudice actually ensues. (*People v. Johnson*, 68 Cal. 2d 646, 660 [68 Cal.Rptr. 599, 441 P.2d 111].) In *Johnson* a reversal was ordered, but an instruction had been given to the jury that the prior inconsistent statements were admissible for the truth of the matters asserted therein (p. 651); "these statements constituted the *sole* evidence" against the defendant and the record showed that the jury had considerable difficulty in its deliberations. (P. 661.) Likewise in *People v. Green*, 70 Cal.2d 654 [75 Cal.Rptr. 782, 451 P.2d 422], the court held that "since we find no other substantial evidence of a narcotics transaction between Porter and defendant on the date charged, the prejudicial nature of the error is manifest . . . and the judgment of conviction must be reversed. (*Chapman v. California* (1967) *supra*, 386 U.S. 18.)" (P. 665.) But in *People v. Bradford*, 70 Cal.2d 333 [74 Cal.Rptr. 726, 450 P.2d 46], the judgment entered on a jury verdict convicting defendant of first degree murder was affirmed (penalty excepted). Therein the Supreme Court found error in the admission of a prior inconsistent statement for all purposes and the jury instruction "that it could consider the investigator's testimony as substantive evidence tending to show that Mr. Butler had in fact seen a 'stack-o-drum'" (p. 345), but applied the *Chapman* test of prejudice (*People v. Johnson*, 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111]) and found the error " 'was harmless beyond a reasonable doubt.' " (70 Cal.2d at p. 345.)

Unlike in *Bradford* the court in the instant case did *not* give a jury instruction that it could consider the prior inconsistent statements as evidence of the truth of the matters asserted therein as then allowed under section 1235, Evidence Code, but did instruct the jury that it could consider the statements on the issue of credibility of the witnesses.[2] Absent

---

[1]386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].

[2]While the court gave neither the instruction that the jury could consider the inconsistent statements as substantive evidence nor an instruction limiting its consideration thereof to impeachment only, it did give the following instruction:

"In determining the credibility of a witness you may consider any

in the record before us are any of the difficulties experienced by the jury in *Johnson* and contrary to the situation in *Johnson* and *Green,* the inconsistent statements here do not constitute the *sole* evidence against defendant, the record reflecting "other substantial evidence" (*People* v. *Green,* 70 Cal.2d 654, 665 [75 Cal.Rptr. 782, 451 P.2d 222]) of defendant's violation of section 12021, Penal Code. According to *People* v. *Johnson,* 68 Cal.2d 646, 660-661 [68 Cal.Rptr. 599, 441 P.2d 111], the governing test of prejudice is that enunciated by the Supreme Court in *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]; "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (386 U.S. at p. 24 [17 L.Ed.2d at p. 710].) Applying the foregoing standard to the evidence in this case, we cannot conclude that absent the constitutionally forbidden statements, "honest, fairminded jurors might well have brought in [not guilty verdict]." (386 U.S. at p. 26 [17 L.Ed.2d at p. 711].) It is fairly obvious from the record that the People sought a conviction on count III on the evidence offered on counts I and II that on February 26, 1968, around 8:05 p.m. defendant, holding Exhibit 2 (identified as such by the victim), robbed Krumhauer in his restaurant and forced him into a storeroom. To corroborate the evidence that it was indeed defendant who held the gun on Krumhauer, the People offered further evidence that the next day Mrs. Bostic, Mark and Milan told the police that around 8:20 or 8:30 p.m. (15 or 25 minutes after the robbery) they had seen the gun in defendant's waistband. In acquitting defendant on counts I and II, the jury rejected the People's evidence that it was defendant holding Exhibit 2 who robbed and kidnapped Krumhauer; however, at the same time it found that "on or about February 26" defendant violated section 12021, Penal Code. Thus, in the light of the foregoing and the following substantial evidence that defendant did have possession, custody and control of the gun from February 7 to February 27, 1968, and was the owner thereof from February 18, 1968, we doubt that in deliberating the issue of defendant's guilt on count III the jury placed much credence in the statements of Mrs. Bostic, Mark and Milan, and we cannot find that "there is a reason-

matter that has a tendency in reason to prove or disprove the truthfulness of his testimony, including but not limited to the following:

"... . . . . . . . . .

"(h) A statement made by him that is inconsistent with any part of his testimony."

able possibility that the evidence complained of might have contributed to the conviction." (386 U.S. at p. 24 [17 L.Ed. 2d at p. 710].) We conclude, as did the court in *People* v. *Bradford,* 70 Cal.2d 333 [74 Cal.Rptr. 726, 450 P.2d 46], "On review of the record we can thus unequivocally state that we 'believe that [the error] was harmless beyond a reasonable doubt.' " (P. 345.)

Loye Bostic lived in Pomona with defendant and her five children. She testified that her home had been broken into and, after discussing the purchase of a gun with defendant who reminded her he was on parole, she bought a .38 caliber revolver (Exh. 2) at Unimart on January 2, 1968, for which she received a receipt (Exh. 3). The gun was registered to her but she never fired or practiced with it although she learned to load it, and kept it on a shelf in the closet in a bedroom occupied by her and defendant; defendant was aware of its whereabouts. On February 26, 1968, she and defendant had been drinking and fighting and she became "concerned with whether or not he would be safe with the gun on the premises" and around 6:30 p.m. with her children drove defendant's car to the residence of defendant's sister, Mrs. Wyler; defendant remained at home; she arrived around 6:45 p.m. and for "safekeeping" gave the gun which was in a little red box to Mrs. Wyler who took it to her bedroom. Around 7:30 she returned home with Mrs. Wyler; they all argued a bit, fed the children and around 8 p.m. drove to Mrs. Wyler's leaving the children at home. Defendant continued the argument at Mrs. Wyler's where he talked to his mother for about ten minutes. Around 8:10 p.m. defendant left the Wyler residence alone and returned home to check on the children; he came back to the Wyler's around 8:40 or 8:45 p.m. They had stopped quarreling and Mrs. Bostic retrieved the gun; they returned home where she put it back on the shelf in the closet.

The next day (February 27) they continued to drink and fight, defendant becoming violent breaking furniture and hitting Mrs. Bostic. In the afternoon she had reason to believe defendant took an overdose of tranquilizers and called an ambulance but defendant left before it and the police arrived. Later defendant returned and again became violent; the police came a second time and Mrs. Bostic asked the officers to take the gun "because again I was worried for him, since he had already taken the pills. I did not know what he might do next" and she was "worried about what he might do to [her] too"; she took the gun out of the closet and gave it to the

officers. Prior thereto, and on February 18, 1966, both Mrs. Bostic and defendant signed a bill of sale (Exh. 4) reflecting the sale of the gun from her to defendant; Exhibit 4 bears her signature and that of defendant and reads, "One .38-caliber Miroku revolver, Serial Number 8001, sold to Sidney Russell Neese [defendant]"; she denied that she sold the gun to defendant, any money or the gun exchanged hands or she bought the gun for him; she said she executed the bill of sale to protect herself in case of involvement with law enforcement over the gun.[3]

Mark is 12 years old and lived with his mother and defendant; on February 26 when he came home from school they were fighting; around 8:20 or 8:30 p.m. he saw something dark brown in defendant's waistband "but I'm not sure it was a gun. I don't even know if it was a gun"; defendant came into the front room where he was watching television and "asked us if we were okay and he also pulled up his shirt and moved something around. I don't know what it was"; he knows what a gun looks like and had seen Exhibit 2 before; asked if he ever saw defendant with the gun, he answered yes, "two or three times" "when he [defendant] was cleaning it or something like that"; asked if the handle of Exhibit 2 was what he saw in defendant's waistband February 26 he answered, "I don't know. All I know something was in the waistband, but I'm not sure"; asked to put Exhibit 2 in his waistband where he saw something that night, he stuck the barrel of the revolver in his waist leaving the handle exposed in the middle toward the right side; when he went with his mother to Mrs. Wyler's she had a red box and handed it to Mrs. Wyler; when his mother and defendant returned around 9 p.m. she carried the red box.

---

[3]"At Mr. Neese's suggestion, because I was somewhat concerned about the gun being on the premises, knowing that he was not to be around a gun; and to reassure me he suggested that we exchange this bill of sale so that if anything did happen with the gun, that I would not be involved."

". . . He reminded me that because he was off on parole, there should not be a gun on the premises; and that he couldn't and shouldn't touch a gun. And we discussed that to some degree. And I said it was actually that it was my home, my gun, and the fact that he lived there shouldn't have any bearing. . . . Then I said the one thing that does worry me—and I know it would worry anyone—that if something did happen, for example, we had been told if somebody broke in to make sure they were inside the house before I shot them. But if somebody, something did happen, that he was to try to protect me and use the gun; or if he did maliciously use the gun, that I would be held responsible because it was my gun. . . . So he suggested making out this bill of sale for my own protection."

On February 27, 1968, Officers Haney and Hower made two calls to Mrs. Bostic's home. At 3:50 p.m. they were dispatched "to a possible overdose" but the victim was not there. Again around 8:30 p.m. they returned "for a disturbance"; they saw lamps and furniture overturned and broken. Mrs. Bostic complained that defendant had struck her and Mark; she gave the gun (Exh. 2) to the officer and asked Officer Haney to unload it as she was afraid of it; "Mrs. Bostic removed it from a bookcase next to the fireplace and handed it to us . . . it was in the bookcase next to a phone book and behind"; Officer Hower, to whom the gun was given, did not notice a red box.

Defendant testified he lived with Mrs. Bostic in "more or less a common law relationship." He had seen the gun and from his testimony it is apparent he also knew its serial number, identifying Exhibit 2. Shortly before Mrs. Bostic purchased the weapon someone tried to break in the house; they discussed getting a gun and that he was on parole and not supposed to have a gun around but as long as it was not taken out of the house or used he thought it would be "all right." He took her to the store and went inside but did not stand at the counter with her at the time she bought the gun; a few days later she brought the weapon home. Defendant denied he had ever used the gun but admitted that he had cleaned it "I think I cleaned it three or four times before I was arrested"; he knew where the gun was kept—in "our bedroom closet." Defendant admitted that he signed the bill of sale (Exh. 4) and explained, "Well, Mrs. Bostic was kind of concerned because I was on parole, and the weapon was in the house, and I felt it would protect her and relieve her mind, then, if she had this because if anything happened to the weapon concerning me, then she couldn't be held responsible for the weapon at all. She wouldn't be leaving the kids or arrested or anything of that type. I insisted that she take it." He testified that at this time he knew he was a convicted felon, admitted conviction of three armed robberies and that possession of the gun by him is a felony; asked if he felt this was for the protection of Mrs. Bostic, defendant answered, "I did because—no—at no time would I have the weapon out of the house in my hands or to use it for any purpose other than for protection of the house"; "Sometimes I'd load it at night when we'd put it on the stand besides the bed. That would be all"; he admitted his parole papers state no firearms; asked concerning the alleged break into Mrs. Bostic's house prior to the pur-

chase of the gun, defendant's answer was vague; he admitted he had cleaned the gun three or four times in twenty days (between February 7 and February 27). Asked, "Who is supposed to use this gun if some burglar came and scared you," defendant answered, "Well, I guess whoever grabbed it. It was on Mrs. Bostic's side of the bed on the nightstand, you know; had it on the—put it on the nightstand. I have it sometimes, yes, and so has she"; asked, "Weren't you wondering who was going to use it?" defendant said, "I can't say I was going to use it or I won't have used it because I don't know. No one ever tried to break in after that time. It was just there on the nightstand in case somebody tried to break into the house." Defendant was asked if his parole papers said "you can't have a firearm except for protection, or do they just say you can't have a firearm?" and he replied, "I believe the exact wording is: 'You cannot have a firearm.'"

From the foregoing the jury obviously concluded that defendant had sufficient possession of and control over the .38 caliber revolver to bring him within the provisions of section 12021, Penal Code;[4] it also appears that while both Mrs. Bostic and defendant tried to explain away the bill of sale the jury was justified in rejecting their explanation and finding as reflected in the document that in fact defendant was the owner of the gun, at least after February 18, and although the weapon was registered in her name Mrs. Bostic actually bought the gun for defendant. As said in *People* v. *Garcia,* 187 Cal.App.2d 93 [9 Cal.Rptr. 493], "Although defendant denied any knowledge of the gun, and Mrs. Diaz, who lived in the home and was originally a defendant, claimed the gun was hers, the jury was not required to give full credence to this testimony." (P. 102.) Ownership alone is sufficient to support the conviction; "Ownership of the gun is all that is required for a violation of the statute." (*People* v. *McCullough,* 222 Cal.App.2d 712, 718 [35 Cal.Rptr. 591]; § 12021, Pen. Code.)

While defendant was charged with a violation "on or about February 26, 1968," the evidence shows that from February 7 to February 27 he exercised dominion and control over the gun and on various occasions had it in his possession for

---

[4]Section 12021, Penal Code, provides in pertinent part: ". . . any person who has been convicted of a felony . . . who owns or has in his possession or under his custody or control any pistol, revolver, or other firearm capable of being concealed upon the person is guilty of a public offense, and shall be punishable . . . ."

purposes of cleaning, loading and placing it on the nightstand in the bedroom occupied by him and Mrs. Bostic ready for use by ''whoever grabbed it'' if the occasion arose. The proof need not conform to the exact date laid in the information, it being sufficient to prove the commission of the offense at any time prior to the filing of the information within the statutory period—the commission of the act here charged is not the kind that does not constitute a crime unless committed on a specific date; time is not of the essence or a material ingredient of the offense; the record shows that defendant was in no manner misled or prevented from making a defense and defendant was in no danger of being placed twice in jeopardy. (*People* v. *Collins,* 54 Cal.2d 57, 60 [4 Cal.Rptr. 158, 351 P.2d 326]; *People* v. *Barreras,* 181 Cal.App.2d 609, 614 [5 Cal.Rptr. 454].)

■ Penal Code section 12021 requires no specific criminal intent. (*People* v. *McCullough,* 222 Cal.App.2d 712, 718 [35 Cal.Rptr. 591]; *People* v. *Vanderburg,* 214 Cal.App.2d 455, 462 [29 Cal.Rptr. 553].) The elements of the instant offense are (1) conviction of a felony and (2) ownership, possession, custody or control of a firearm capable of being concealed on the person (*People* v. *Nieto,* 247 Cal.App.2d 364, 368 [55 Cal. Rptr. 546]; *People* v. *Hilliard,* 221 Cal.App.2d 719, 724 [34 Cal.Rptr. 809]; *People* v. *Hunt,* 221 Cal.App.2d 224, 227 [34 Cal.Rptr. 421]; *People* v. *De Prima,* 172 Cal.App.2d 109, 112 [341 P.2d 840]); and general intent to commit the proscribed act is all that is necessary. (*People* v. *McCullough,* 222 Cal. App.2d 712, 718 [35 Cal.Rptr. 591].) ■ Defendant was convicted of robbery, a felony, on May 23, 1963; defendant admitted he was a convicted felon and a parolee and knew that he could not have a firearm; and Mark and the weapon itself demonstrated that Exhibit 2 was capable of being concealed on the person.

■ ''Possession of [a gun] may be proved circumstantially and it is not necessary to show that the accused was in exclusive possession of the premises. (See *People* v. *Flores,* 155 Cal.App.2d 347, 349 [318 P.2d 65]; *People* v. *Van Valkenburg,* 111 Cal.App.2d 337, 340 [244 P.2d 750].)'' (*People* v. *Ortiz,* 210 Cal.App.2d 489, 497 [26 Cal.Rptr. 677].) Possession of a firearm for even a limited time and purpose may be sufficient to bring defendant within the statute. (*People* v. *Vanderburg,* 214 Cal.App.2d 455, 460 [29 Cal.Rptr. 553].) Defendant and Mrs. Bostic had discussed the purchase of a gun and defendant took her into the store to buy it; he

thought it would be "all right" to have the gun around the house; he was familiar enough with the weapon to know the serial number; in 20 days defendant cleaned the gun "three or four times" and sometimes he would "load it at night when we'd put it on the nightstand besides the bed"; defendant admitted signing the bill of sale, that the gun was to be used for the protection of the house, keeping it on the nightstand in their bedroom and that "whoever grabbed it" would use it if a burglar came; and he further admitted, "I have it [the gun] sometimes, yes, and so has she." From Mrs. Bostic's conduct in relation to the gun, the inference is reasonable that defendant indeed had the gun in his possession and under his custody and control during those 20 days—she removed the firearm from the premises for "safekeeping" when defendant was drinking and fighting because she was concerned "whether or not he would be safe with the gun on the premises," and the next day she gave the gun to the officers because "she did not know what he would do next" and was also "worried what he might do to [her] too"; and inherent in her request of Officer Haney that he unload the gun because she was afraid of it, is Mrs. Bostic's admission she knew little about and feared the weapon. Contrary to Mrs. Bostic's insistence that the gun was always kept in the closet, defendant himself readily admitted that at various times he cleaned and loaded it and placed it on their nightstand in the bedroom and "sometimes" he had the gun, as did she; and both officers testified that when she gave the gun to them she took it, not from the closet, but from the bookcase in the living room. It can hardly be denied in the light of the foregoing that at all times the gun was readily available to defendant, he did exercise control over it, he did have it in his possession for the normal purposes of preparing and keeping the gun ready for use, at night it did lay loaded on the nightstand near his bed and he would have used the weapon had the occasion arisen. Although he and Mrs. Bostic sought to deny his possession, control and ownership of the gun, in the light of the totality of the evidence the jury was not required to give credence to this testimony. (*People* v. *Thompson,* 252 Cal.App.2d 76, 88-89 [60 Cal.Rptr. 203] ; *People* v. *Garcia,* 187 Cal.App.2d 93, 102 [9 Cal.Rptr. 493].) As stated in *People* v. *Nieto,* 247 Cal.App.2d 364 [55 Cal.Rptr. 546], "At the very least, this is circumstantial evidence supportive of a finding of joint or constructive possession, custody or control of the guns by appellant, and sufficient to

sustain his conviction. (See *People* v. *Hunt,* 221 Cal.App.2d 224, 227 [34 Cal.Rptr. 421] ; *People* v. *Garcia,* 187 Cal.App.2d 93, 101-102 [9 Cal.Rptr. 493] ; *People* v. *Pearson,* 150 Cal. App.2d 811, 818 [311 P.2d 142].) '' (P. 368.)

The judgment is affirmed.

Wood, P. J., concurred.

THOMPSON, J.—I dissent. In my view, *People* v. *Johnson,* 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111] and *People* v. *Green,* 70 Cal.2d 654 [75 Cal.Rptr. 782, 451 P.2d 422] require that the judgment of conviction be reversed. Comity to a decision of the Court of Appeal of the Third District in *People* v. *Pierce,* 269 Cal.App.2d 193 [75 Cal.Rptr. 257] indicates a similar result.

## FACTS

Appellant was charged in a three-count information with robbery (count I), kidnaping for the purpose of robbery (count II), and possession of a concealable firearm, he having previously been convicted of a felony (count III).

All three counts of the information charge offenses occurring on or about February 26, 1968. On that day, Mr. Paul Krumhauer was present at the spaghetti restaurant owned and operated by him. At about 8 p.m., a man whom Krumhauer thought to be a customer came in. As Krumhauer approached, the man displayed a black, snub-nosed revolver and demanded the money in the cash register. Krumhauer opened the register and the robber took the bills from it. The robber forced Krumhauer at gunpoint to walk to the kitchen of the restaurant where he took the victim's wallet. Krumhauer identified appellant as the robber.

Mrs. Loye Bostic and her four children lived with appellant. At the trial she testified that she owned a .38-caliber revolver which she had purchased for her protection and of which appellant had knowledge. On February 26, 1968, Mrs. Bostic and appellant had an argument, and Mrs. Bostic, fearing the presence of the weapon, gave it to Mrs. Sharon Wyller, appellant's sister, for safekeeping. Later that evening appellant and Mrs. Bostic went to the Wyller residence. They stopped quarreling and Mrs. Bostic retrieved the revolver. Mrs. Bostic's testimony was that she had never seen the gun in appellant's possession. The prosecution then, without objection, introduced evidence of prior inconsistent statements by Mrs. Bostic on February 27 that on February 26, 1968, at

approximately 8 p.m., appellant had the revolver in his possession. Mrs. Bostic explained the prior statement as having been made in her anger against appellant because of a resumption of the prior quarrel. On February 27, she had called the police and given them the gun.

Mrs. Bostic's 12-year-old son, Mark, and 16-year-old daughter, Milan, both testified to seeing something brown in appellant's waistband on February 26 but that they could not identify it as a revolver or other weapon. The prosecution, also without objection, introduced prior inconsistent statements by Mark and Milan that the brown object was a revolver. Both also testified that they had made the prior statements because of their anger at appellant.

Other evidence introduced without objection disclosed a bill of sale dated February 18, 1968, from Mrs. Bostic to appellant for "One .38 caliber Miroku revolver, Serial Number 8001" (People's Exhibit No. 4) and that on occasions prior to February 26, appellant had cleaned the weapon. Mrs. Bostic explained that the purpose of the bill of sale was to protect her from any legal involvement concerning the revolver but that she had never delivered the gun to appellant.

The defense testimony, while admitting appellant had "cleaned" the gun, denied his possession of it. The testimony also included substantial alibi evidence with respect to the robbery. The jury, on May 17, 1968, acquitted appellant of the counts of robbery and kidnapping but convicted him of the count involving possession of the revolver. Appellant was sentenced to state prison and this appeal followed.

### CONTENTIONS OF APPELLANT AND RESPONDENT

Appellant's grounds of appeal are: (1) that the trial court erred in admitting as substantive evidence the prior inconsistent statements regarding possession by appellant of the revolver; and (2) that the trial judge should have on his own motion instructed the jury to limit its consideration of those statements to impeachment.

Respondent concedes that admission of the inconsistent statements as substantive evidence violates the rule of *People v. Johnson,* 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111]. Respondent, however, argues that: (1) no objection to the evidence was made here nor limiting instruction requested, thereby making the *Johnson* rule inapplicable; and (2) any error in this regard is nonprejudicial.

## Inconsistent Statements as Substantive Evidence— Absence of Limiting Instructions

Accepting respondent's well-founded concession that the evidence of prior inconsistent witness statements is rendered incompetent by *Johnson,* we must determine the consequences of the failure of appellant at trial either to object to the admissibility as substantive evidence of the prior statements or to request an instruction that the jury should consider those statements only for the purpose of impeachment. In view of the ostensibly unimpaired existence of Evidence Code section 1235 at the time of trial of the case at bench, and *Johnson* which after the completion of the trial held section 1235 inapplicable to criminal cases, that failure must be deemed excused. Appellant may, therefore, properly raise the claimed error in this appeal. (*People* v. *Pierce,* 269 Cal.App. 2d 193 [75 Cal.Rptr. 257]; *People* v. *Odom,* *(Cal.App.) 71 Cal.Rptr. 260; *People* v. *Vinson,* 268 Cal.App.2d 672 [74 Cal.Rptr. 340].)

### Prejudice

If the validity of the conviction which is now before us for review were to be tested by the standard of sufficiency of the evidence to support a guilty verdict or perhaps if the test of review were that of determination of a miscarriage of justice within the meaning of section 13, article VI of the state Constitution,[1] there would be good reason to affirm the judgment. *People* v. *Johnson, supra,* 68 Cal.2d at page 660, however, requires that the prejudicial character of the admission as substantive evidence of inconsistent statements of the witnesses and the failure to instruct that the testimony could be considered only for impeachment be tested by the rule of *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. That rule requires that the judgment of conviction be reversed unless the respondent has succeeded in convincing the reviewing court beyond a reasonable doubt that the error

---

*A hearing was granted by the Supreme Court on October 23, 1968. The opinion of that court is reported in 71 Cal.2d —— [78 Cal.Rptr. 873, 456 P.2d 145].

[1]The learned and esteemed justices of the majority seemingly have risen to the bait of decisions affirming judgments of conviction for sufficiency of evidence. See for example the following citations in the majority opinion: *People* v. *Thompson,* 252 Cal.App.2d 76 [60 Cal.Rptr. 203]; *People* v. *Garcia,* 187 Cal.App.2d 93 [9 Cal.Rptr. 493]; *People* v. *Nieto,* 247 Cal.App.2d 364 [55 Cal.Rptr. 546]. In my opinion, neither the holdings nor language of those cases is applicable to the case before us.

was harmless. I cannot find that respondent has carried its burden in the case at bench.

*Chapman* suggests two approaches in applying its rule. The court on review is required to ask "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction," (17 L.Ed.2d at page 710) and whether, absent the error, "honest, fair-minded jurors might very well have brought in a not guilty verdict." (17 L.Ed.2d at page 711.) The record is clear that the theory of the prosecution's case at trial was bottomed upon proof by the improperly admitted out-of-court statements that appellant was in sole possession of the proscribed weapon on February 26, 1968. The statements were corroborated by evidence of a bill of sale of the gun to appellant and testimony that on occasions other than on February 26 he had cleaned it. While the corroborating evidence could have been the basis of a prosecution upon the theory that appellant was a joint possessor of the gun with his paramour and thus guilty of the crime charged, I cannot accept the proposition that there is no reasonable possibility that the constitutionally improper evidence contributed to the conviction or that honest, fair-minded jurors might not have brought in a verdict of not guilty had that evidence been excluded.

Examination of the two decisions of our Supreme Court since *Johnson,* which have considered the *Chapman* rule in the context of evidence held improperly admitted by the rule of *Johnson,* supports the conclusion here reached. In *People* v. *Bradford,* 70 Cal.2d 333 [74 Cal.Rptr. 726, 450 P.2d 46], the error was determined to be harmless beyond a reasonable doubt where the tainted evidence was consistent with the theories of both the defense and the prosecution and hence damaging to neither. *Bradford* contrasts with *People* v. *Green,* 70 Cal.2d 654 [75 Cal.Rptr. 782, 451 P.2d 422]. In *Green,* error in admitting prior inconsistent statements as substantive evidence was found prejudicial in spite of other evidence tending to establish guilt. There the reluctant witness when confronted by his prior inconsistent statement implicating the defendant stated that he "guessed" he had told the truth at the time of the inconsistent statement. Additional evidence tended to prove that the defendant was guilty of the crime charged (furnishing marijuana to a minor) at a time other than that alleged in the information.

In my judgment the case before us is made analogous to *Green* and distinguishable from *Bradford* by the presence of

important heavily damaging evidence of the prosecution received in the commission of constitutional error.[2] (See *Chapman* v. *California*, 17 L.Ed.2d at page 710: "An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot . . . be conceived of as harmless.")

There is a further ground for finding a reasonable doubt of the effect of the improperly admitted evidence upon the conviction. Appellant testified in his defense. On cross-examination he exhibited a damaging familiarity with the serial number of the weapon and admitted cleaning it and that he might have used it to repel a prowler if the occasion had arisen. In the language of Division Four of this court: "[W]e can only speculate as to whether [he] would have testified at all if the evidence . . . had not been admitted."[3] (*People* v. *Wilson*, 268 Cal.App.2d 581, 587 [74 Cal.Rptr. 131].)

To hold that in the case at bench the error is nonprejudicial beyond a reasonable doubt is to apply that "overemphasis upon the courts' view of 'overwhelming evidence'" that is condemned by the Supreme Court of the United States in *Chapman* v. *California* (386 U.S. 18, 23 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 827]).

I would reverse the judgment of conviction.

A petition for a rehearing was denied May 22, 1969. Thompson, J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied June 18, 1969. Peters, J., and Tobriner, J., were of the opinion that the petition should be granted.

---

[2]The majority analyzes *Green* as a decision in which the only evidence of guilt consisted of the improperly admitted witness statements. The court in that case, however, stated: "Since the two most damaging statements of the witness Porter are inadmissible as substantive evidence, and since we find no other substantial evidence of a narcotics transaction between Porter and defendant on the date charged, the prejudicial nature of the error is manifest . . ." (70 Cal.2d p. 665.) (Underscoring added to indicate portion omitted from the sense of the majority's analysis of *Green*.) In the case at bench, the evidence other than improperly admitted statements tending to establish guilt similarly does not pertain to possession "on the date charged." I cannot accept the proposition that that language of *Green* is without significance. Rather the words tend to emphasize the need in applying the *Chapman* rule to look to the case as tried and not to how it might have been tried. (*Ross* v. *California*, 391 U.S. 470 [20 L.Ed.2d 750, 88 S.Ct. 1850], reversing *People* v. *Ross*, 67 Cal.2d 64 [60 Cal.Rptr. 254, 429 P.2d 606].)

[3]Since the majority opinion stresses appellant's testimony as of primary significance, it is safe to assume the trier of fact did also.