[Crim. No. 11157. Second Dist., Div. Four. May 27, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. BESSIE YORK, Defendant and Appellant.

Elinor Chandler Duncan for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Respondent.

JEFFERSON, J.—Defendant was convicted by a jury of first degree murder for the killing of her 9-year-old son, Kenneth York. The jury acquitted Lewis Johnson, another son of defendant, who was also charged with Kenneth's murder. Probation and defendant's motion for a new trial were denied and she was sentenced to state prison for the statutory term. This is an appeal from the judgment.[1]

At the trial Rosalyn Johnson, the 13-year-old daughter of defendant, was called to the witness stand by the prosecution and asked to relate what she saw on November 15, 1964, the day Kenneth died. She stated she could not remember what happened that day. Further questioning elicited, however, that she did remember having testified previously and that everything she said on that previous occasion was the truth. It was stipulated Rosalyn had testified at the preliminary hearing and that her testimony was taken down by an official court reporter "as given" by her. Rosalyn was shown a transcript (which was stipulated to be a correct transcription of the reporter's notes) of her testimony at the preliminary hearing, and was asked to read it to see if it would refresh her memory. After a short recess the witness was asked if she had read the transcript. She replied affirmatively, but stated that she still could not remember the events of November 15, 1964; that the transcript had not helped her to recall those events. Thereafter, over defendant's objection, and purportedly under the authority of Code of Civil Procedure, section 2047, the court permitted the deputy district attorney to read into the record the preliminary hearing testimony of the witness.

Rosalyn remained present in court while the testimony was being read. She was then recalled to the witness stand and again asked if she remembered what transpired on November 15 or what she had said in the courtroom when she had previ-

---

[1]At defendant's request, we have augmented the record on appeal to include the instructions given and refused as those instructions appear in the original superior court file.

ously testified. Again she answered that she did not remember. Defendant interposed a motion to strike the testimony, which motion the court denied.

In the testimony introduced, Rosalyn related how her mother (defendant) had become angry at Kenneth for putting Ajax into a bucket of water rather than soap powder when she had directed him to scrub the floor of their residence. She told Kenneth to put his hands against the wall and began beating his backsides with a long stick about the size of a broom handle. When he fell to the floor she made him get up and continued to beat him. The stick eventually broke and Rosalyn was directed to get another one from the yard. She found a long flat stick. This one also broke and Rosalyn got a third one, like a broom handle or mop stick. Rosalyn then went to her room with her sisters. Her mother was still beating Kenneth. She did not see her mother use the third stick but she heard Kenneth "holler." Later, when she returned from the laundromat, Rosalyn saw her older brother Lewis Johnson (codefendant) beating Kenneth with a belt. He also struck him in the face with his fists. Kenneth kept falling down; Lewis would pick him up. This went on for about half an hour. At the end Kenneth was unable to rise. When she returned from the store at 1:30 Kenneth was lying on a mat in the bedroom. They got him up to feed him but he could hardly walk; nor could he keep down the lunch they tried to feed him. They put him back on the mat and felt his pulse. Defendant then gave Rosalyn a dime to call the police, and she did so.

The following additional evidence was introduced:

Officer Bunton testified that he arrived at defendant's residence at 2:45 p.m. on November 15, a few minutes after receiving a call to go there. He found Kenneth lying on a mattress in the north bedroom. He felt no heartbeat and the body was cold. There was blood on the upper and lower lips. Defendant told him her son had fallen in the bathroom. Lewis Johnson, another son of defendant, said the fall had taken place an hour or so before.

William York, defendant's husband, testified that he whipped Kenneth about a month before the boy's death; at that time Kenneth had jumped back from him and struck his head on a light switch hanging from the wall. About two and one-half weeks before the boy died he noticed a swelling and a patch on the back of the boy's head. He did not inflict this injury. Two days before Kenneth's death he had a conversa-

tion with his wife after he came home from work. She told him that she had to give Kim, their 8-year-old child, a licking; that she was just upset about having lost her baby a few months before. (The child was born dead.) York noticed marks on Kim's body. Defendant told him Rosalyn had beaten the girl like that. He told defendant that in her state of mind he did not want her whipping the children; that he would chastise them when he came home.

On November 15, 1964, Kim was examined by a doctor who found injuries, bruises and whip marks on her body.

A chemist discovered a small trace of blood on a wooden stick found at defendant's residence; also, three small cotton fibers which were similar to those in the dead boy's shirt. The shirt had numerous holes in it which could have been made by a broken stick.

A doctor testified that he performed an autopsy on the body of the boy. Death was attributed to multiple head injuries inflicted from 1 to 48 hours before his death; all were approximately the same age and were located in all portions of the scalp. (This usually implies multiple blows and leaves some implication of human action.) There were indications of too many blows to be countable. There were also scars, scratches and a small stab wound, about 1 inch deep, on the body. The latter had nothing to do with the death but might have caused considerable pain.

Codefendant Lewis Johnson testified that he was the 19-year-old son of defendant. On the morning of November 15 (Sunday) he saw his mother strike Kenneth once with a flat piece of wood. She kept asking Kenneth why he ''did it'' and Kenneth kept replying that he ''wouldn't do it any more.'' When he saw defendant strike Kenneth, he intervened. Defendant gave him the stick and told him to whip the child. He hit Kenneth lightly three times on the seat. Unintentionally, he struck him once on the head. However, it was not a hard blow. Later the same day, when he returned from the laundromat, defendant was ''getting after'' Kenneth again. She asked Kenneth why he pushed the baby into the wall. She started whipping Kenneth but he managed to stop her. When he returned, after making a second trip to the laundromat, defendant was again ''hollering'' at Kenneth. Kenneth appeared weak and had trouble eating soup which they attempted to feed him. After lunch he carried Kenneth into the bedroom. When he checked him later he found that the back of his head appeared soft. His pulse was slow and there

was practically no heartbeat. Defendant brought a pillow for Kenneth. When he told her he thought Kenneth had a fractured skull, she started crying. He told defendant they should call an ambulance. While waiting for the ambulance he gave Kenneth mouth to mouth resuscitation. Defendant told Kim to go to the bedroom so the police would not see her; she told the other children not to say anything, to say they did not know what happened.

Lewis further testified that Kenneth had fallen in the bathroom that morning; he heard a thud; defendant told him he fell against the tub; he saw defendant beat Kim Friday night.

Defendant did not testify.

 Defendant contends the trial court committed prejudicial error in permitting the preliminary hearing testimony of her daughter Rosalyn to be read into evidence. The witness' testimony was admitted as her past recollection recorded. We conclude that it was properly admitted.

 Where it is shown that a witness has no present recollection of a particular event but the witness' recollection of the event was recorded in a memorandum, if the witness is able to say the memorandum was correct when he made it, the memorandum may be read into evidence as his past recollection recorded. (Code Civ. Proc., § 2047;[2] *People* v. *McFarlane,* 138 Cal. 481 [71 P. 568, 72 P. 48, 61 L.R.A. 245]; *People* v. *Keelin,* 136 Cal.App.2d 860 [289 P.2d 520, 56 A.L.R.2d 355].) It is settled that a properly authenticated transcript of a witness' former testimony qualifies as a memorandum under the section. (*People* v. *McFarlane, supra,* 138 Cal. 481, 488.)

 The required foundation was laid in this case. The witness clearly indicated that she could not recall the events in question. After being shown the transcript of her former testi-

---

[2] Section 2047 provides: "A witness is allowed to refresh his memory respecting a fact, by anything written by himself, or under his direction, at the time when the fact occurred, or immediately thereafter, or at any other time when the fact was fresh in his memory, and he knew that the same was correctly stated in the writing. But in such case the writing must be produced, and may be seen by the adverse party, who may, if he choose, cross-examine the witness upon it, and may read it to the jury. So, also, a witness may testify from such a writing, though he retain no recollection of the particular facts, but such evidence must be received with caution."

The trial court instructed the jury in accordance with the concluding sentence of section 2047: "The testimony of Rosalyn Johnson as read from the transcript of the preliminary examination must be received with caution."

mony as to those events, she still had no recollection. She did remember that she had testified and that what she said was true. It was stipulated "that the present witness Rosalyn Ann Johnson did there testify (at the preliminary hearing) and that the testimony which is offered in this transcript was taken down at that time as given by this witness by an official court reporter." This stipulation, plus the witness' testimony that what she then said was the truth, fulfilled the requirements of section 2047 thus permitting the reading of her recorded recollection.

Defendant claims her case was prejudiced because the trial court required her defense counsel to make a motion for a mistrial in the presence of the jury contrary to defense counsel's wishes.

The record indicates that the deputy district attorney sought to introduce evidence that in 1957 defendant had beaten one of her children. Initially, he asked William York, defendant's husband, whether in 1957, in Pittsburg, defendant was arrested for beating one of her children. Before an answer was given counsel for defendant said she wished to make a motion at the bench. The court stated it did not think the question asked was proper but would not allow counsel to approach the bench to make her motion. Counsel then made a motion for a mistrial on the ground that the prosecution's reference to defendant's prior arrest denied defendant a fair trial. The court denied defendant's motion, and stated: "The question, in my opinion, is not a proper one. There has been no answer to it. The jury will disregard entirely the matter of the asking of the question and cast it out of your mind as though you had never heard it. It has nothing to do with this case."

██ While it is not improper for the court to require the discussion of the merits of an objection to the admission of evidence in the presence of the jury unless it appears there is the possibility that the discussion may influence or prejudice the jury against one side or the other, ordinarily, on doubtful questions of evidence, the best procedure is to discuss the questions outside of the jury's presence. (*People* v. *Terry,* 180 Cal.App.2d 48, 53-54 [4 Cal.Rptr. 597].) ██ It is apparent here that the court considered the asking of the question to be an obvious mistake on the part of the deputy district attorney, and that no extended discussion was called for. The jury was promptly and properly admonished that it was to disregard the question. Certainly, no prejudicial error was present.

■ Evidence of the beating incident that apparently led to the arrest referred to, was subsequently admitted — and properly so as the following discussion indicates.

Mr. York testified over objection that in 1957 defendant whipped one of her children. Also presented was evidence that she had beaten her 8-year-old daughter Kim two days before Kenneth's death; and that a doctor examined the child and found injuries and whip marks on her body. We find no merit in defendant's contention that this evidence had no effect but to prejudice her in the eyes of the jury. ■ Evidence of prior assaults is admissible to prove material elements of the current offense. (*People* v. *Zankich,* 189 Cal.App.2d 54, 62-66 [11 Cal.Rptr. 115]; *People* v. *Bufarale,* 193 Cal.App.2d 551, 558-559 [14 Cal.Rptr. 381].) ■ The evidence was clearly relevant as tending to show guilty intent and to rebut any claim that the child's injuries were inflicted by accident in the course of a legitimate punishment of Kenneth.[3]

Defendant contends that the court failed to instruct the jury on the specific intent required to establish murder by torture. ■ The jury was instructed that, ''All murder which is perpetrated by means [*sic*] torture, or by any other kind of wilful, deliberate and premeditated killing, is murder of the first degree, and all other kinds of murder are of the second degree.'' An instruction was also given that, ''It is murder by torture where the intent of the accused is to inflict grievous pain and suffering upon the victim either for the purpose of revenge, extortion, persuasion, punishment or to satisfy some other untoward propensity. It is not necessary that the accused shall have the intent to kill the victim.'' These were ample instructions to sufficiently apprise the jury

---

[3]The trial court properly instructed the jury that this was the limited effect of this testimony, saying: ''Evidence was offered in this case for the purpose of showing that the Defendant, Bessie York, committed other acts, than the one of which she is accused, and for which she is on trial in this action.

''Such evidence was received for a limited purpose only, not to prove distinct offenses, or continued criminality, but for such bearing, if any, as it might have on the question whether the defendant is innocent, or guilty of the crime charged against her in this action. You are not permitted to consider that evidence for any other purpose, and as to that purpose, you must weigh such evidence as you do all other in the case.

''The value, if any, of such evidence depends on whether it shows that the Defendant, Bessie York, possessed that state of mind which demonstrated it was her intent to inflict grievous pain and suffering upon the person of Kenneth York to satisfy some untoward propensity possessed by her, and to show that death did not result accidentally as the Defendant, Bessie York, was administering punishment to the said Kenneth York in a lawful and proper manner.''

as to the intent required. (*People* v. *Cooley,* 211 Cal.App.2d 173, 208 [27 Cal.Rptr. 543].)

Defendant contends that she was prejudiced by the introduction of evidence of statements made by her codefendant son to the police.

During the course of the cross-examination of Lewis, the deputy district attorney asked him about a conversation which he had with a police officer on November 19, 1964, (five days after the child's death) at the Compton Police Station. The first reference to the conversation came after Lewis had testified that he had observed his mother (defendant) strike Kenny with a belt shortly before his death but that Kenny had not fallen when he was hit.

When the questioning pertaining to Lewis' statement to the police was initiated, counsel for defendant asked permission to take the witness on *voir dire* to ascertain whether the statement made was free and voluntary and whether Lewis had been advised of his constitutional rights prior to making it, as required by *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. Lewis' counsel stated that he was satisfied "the requirements were met." Defendant's counsel, however, stated she was not satisfied. The court denied the request of defendant's counsel to be allowed to *voir dire* the witness, stating that no *Dorado* issue was involved but that a foundation should be laid that the statement was voluntary. The prosecution then established that the statement was voluntary.

Lewis was thereafter questioned as follows:

"Q. All right. And in that conversation did you state to Detective Morrison—well, let me give you the question first. The question: 'He kept hanging his head down'. Did you then answer, 'Yes. And when she hit him with the belt, he fell on the suitcase. And she said, "Get up." And he got up kind of slow. And I say, "Well, Kenny's tired and he ain't had anything to eat since about Friday." ' '

"Did you make that statement to Detective Morrison?

"A. Yes, sir.

"Q. Pardon?

"A. Yes, sir.

"THE COURT: Were you telling him the truth then?

"THE WITNESS: Yes, sir."

Lewis then said, in response to further questioning, that he told the officers he had struck Kenny with his fists, but that was because "he didn't want to make it look too bad" for his mother; he told the officer he had not hit the boy hard enough

to hurt him but just hard enough to make him turn his head; he had stated to the officer that his mother told him, prior to the arrival of the police, to tell the police that Kenny had fallen in the tub; he heard her say something to the other children at the time but did not pay attention to what it was.

The witness was then asked:

"Q. Going back to this conversation that occurred the 19th of November, with Detective Morrison, do you remember being asked this question: 'Now, was the broom handle or anything in the bedroom at that time?' Did you answer, 'Yes.' And were you asked, 'Was it broken or was it'—and you answered, 'It was broken.'

"You were asked again, 'It was broken?' And you answered, 'Yeah, it was broken.'

"A. At the time I didn't mean the broom handle was—it was thinner than a broom handle, like a mop handle."

And later:

"Q. Well, going back to this conversation on the 19th, with Detective Morrison, does this refresh your recollection: 'And she said, ''Get in the bathroom and pull your pants down.''' And you were asked: 'And that's when she shoved him and he fell down?' And you answered, 'Yeah.' Do you recall that?

"A. Yes, sir."

Thereafter, during a recess of the trial, counsel for defendant made a motion for a mistrial and for severance of the trial on the ground that the court should have permitted counsel to conduct a *voir dire* examination of Lewis; that counsel had just become aware that defendant was not present when Lewis made the statements alluded to by the district attorney; that the statements were therefore hearsay as to defendant and the jury should have been instructed that the statements were admissible only as against Lewis. The court denied the motions. When counsel for defendant was then allowed to cross-examine Lewis, it was elicited that defendant was not present when Lewis made the statement in question. Counsel then asked that the jury be admonished that it could consider this evidence only as against Lewis. Then the court gave the following instruction: "The law, ladies and gentlemen, is this: That strictly speaking and by itself what one person says to another person outside the presence of a third person constitutes hearsay as far as the third person is concerned. That is, the situation standing by itself. Now, if one person has had a conversation with a second person, and it

differs from the one person's present recollection of certain events recited in that conversation, and thereafter the witness' attention is called to that conversation between himself and the second person, and he says in substance, 'Oh, yes, now I remember, it was the way I said it in that conversation and I now say that that was true, that is what the fact is,' that constitutes evidence. When we know what the situation was, from the witness as to the situation, and if it relates to a third person and the first person, the witness is on the witness stand, subject to cross examination, then the evidence is in the record as against the third person. It's a rather confusing situation, but I think you will understand what I mean.''

We conclude that because the instruction requested by defense counsel was too broad, it was properly refused.

The instruction given by the trial court and above quoted was correct as far as it went. As we shall point out, one matter was not covered which, had it been specifically drawn to the attention of the trial court, could properly have been included; however, we find no error on the part of the court in not raising it on the court's own motion.

So far as herein involved, the evidence concerning Lewis' statement to the police added only two matters which were not repetitious of his oral testimony on the stand: (1) the police statement concerning Kenneth's alleged fall was inconsistent with Lewis' courtroom version of what occurred; and (2) his account to the police contained the statement that defendant York told Lewis to tell the police Kenneth's death resulted from a fall without mentioning the beatings—a fact which, if true, tended to show a consciousness of guilt on her part.

Since Lewis' testimony on the stand in these two instances was inconsistent with his prior statement, it was, of course, entirely proper to cross-examine him thereon. As to the ''fall'' matter, the effect of the cross-examination was to refresh Lewis' memory. He stated on the stand that the earlier version was the correct one, thereby adopting that portion of his prior statement as his testimony. It became his direct testimony, admissible as such for all purposes and applicable to all parties. The trial court's instruction adequately covered this portion of the evidence.

Lewis' prior statement to the officer concerning what his mother told Lewis to say, however, was never adopted by him on the stand. No one asked him if that part of the statement was true and he did not volunteer anything about it.

Under these circumstances, the earlier statement was available for whatever impeaching value the jury might find that it had. Considered for this limited purpose, the evidence objected to was admissible and the instruction on credibility of witnesses (CALJIC 52 revised), given by the court at the close of the trial, was proper and adequate.

However, since this portion of the police statement was not adopted by Lewis as part of his courtroom testimony, it had no value other than for impeachment and was not admissible against defendant York as proof of the truth of that version. Had the trial court been asked, clearly and expressly, to instruct the jury to that effect it should, and presumably would, have done so. It is the duty of trial counsel, and not of the trial judge, to recognize this kind of evidentiary problem, and to call to the court's attention the fact that instructions given, correct as far as they go, should have gone further. In the whole context of this trial, we cannot say that there was error or prejudice.

The judgment is affirmed.

Files, P. J., and Kingsley, J., concurred.