[Crim. No. 7670. First Dist., Div. One. Jan. 28, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
PAUL JACKSON, Defendant and Appellant.

**COUNSEL**

Paul A. Dezurick, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Robert R. Granucci and Horace Wheatley, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SIMS, J.**—Defendant has appealed from his conviction, following a jury trial, of statutory rape (Pen. Code, § 261, subd. 1) of his 8-year-old mentally retarded stepdaughter. In proceedings under former sections 5500 et seq. of the Welfare and Institutions Code, the defendant was found not to be a mentally disordered sex offender; his motion for a new trial was denied; and he was sentenced to state prison as recommended in the jury's verdict (see Pen. Code, § 264), with an admitted prior conviction in 1958 of assault with a deadly weapon in violation of section 245 of the Penal Code.[1]

Defendant contends that prejudicial error occurred in admitting evidence of prior inconsistent testimony and extrajudicial statements of his wife, the mother of the victim, for proof of the truth of what was therein asserted, and in admitting in evidence his clothing which had been taken into legal custody when he was arrested for another offense. No error is found in the latter connection. Developments in the law since the time of trial demonstrate that there was error in the unqualified admission of the prior inconsistent statements. The record fails to establish that this error was not prejudicial under standards applicable to a deprivation of a constitutional right.

---

[1]Defendant was charged in a second count with violation of section 288 of the Penal Code and with an earlier second prior conviction of theft in Louisiana which he denied. That prior conviction was subsequently dismissed on motion of the district attorney. The jury was instructed that any finding of guilt should be in the alternative, i.e., either rape with recommendation of imprisonment in the state prison, same with recommendation of imprisonment in the county jail, lewd and lascivious conduct, or child molestation (Pen. Code, former § 647a, subd. (1), now § 647a), as a lesser and included offense.

Shortly after taking a drive with the defendant on the night of June 30, 1968, the victim was found to be bleeding as a result of a tearing of the vaginal and rectal tissue. She subsequently received extensive remedial surgery. Circumstantial evidence, hereinafter reviewed, pointed to a sexual attack by the stepfather as the cause of her injuries. The testimony and statements set forth below were received in evidence.

*Prior Testimony and Statements*

■ In his opening statement the prosecutor stated that the mother of the victim would testify concerning what the defendant at the time had said that he had done in reference to his stepdaughter while he and she were out on a drive together alone. When the witness acknowledged that she had a conversation with her husband concerning the child during the subsequent drive in which all three were present in the car, the defendant's objection on the ground the corpus delicti had not been established was overruled. The witness testified, "He had told me that the baby had been complaining about her stomach earlier that day and he wanted to know if I had any idea what was wrong with her." Thereupon the prosecutor inquired, "Did you have any other conversation with him concerning the child?" ■■ The witness responded, "Not that I know of."[2]

---

[2]The question of whether the alleged statements were in fact inconsistent with the witness' testimony merits consideration. In *People* v. *Sam* (1969) 71 Cal.2d 194 [77 Cal.Rptr. 804, 454 P.2d 700] the court observed, "Because there is no inconsistency and therefore no impeachment value in statements the witness claims to have forgotten, 'its only value to the proponent [would] be as substantive evidence of the facts asserted.' (McCormick on Evidence (1954) p. 73; see Wigmore, *op. cit. supra,* § 1043, p. 736.) It is just such use, of course, that, as we pointed out in *Johnson,* the Constitution prohibits. [Fn. omitted.]

"Nor are we without ample authority for our conclusion that 'The right of impeachment does not exist where the witness states he has no recollection of the fact concerning which he is examined.' (*Sponduris* v. *Hasler* (1966) 246 Cal.App.2d 207, 214 . . .) This is not only the rule in California, but according to Wigmore (*op. cit. supra,* § 1043) it is the general English and American rule, confirmed by similar holdings in other jurisdictions. [Citations and fn. omitted.] In enacting section 1235 of the Evidence Code, the Legislature has retained the fundamental requirement that the witness' prior statement in fact be '*inconsistent* with his testimony at the hearing' before it can be admitted. That requirement was unfulfilled herein." (71 Cal.2d at pp. 209-210. See also, *People* v. *Coleman* (1969) 71 Cal.2d 1159, 1164 [80 Cal. Rptr. 920, 459 P.2d 248]; *People* v. *Spencer* (1969) 71 Cal.2d 933, 942, fn. 10 [80 Cal.Rptr. 99, 458 P.2d 43]; *People* v. *Green* (1969) 70 Cal. 2d 654, 656, fn. 1 [75 Cal.Rptr. 782, 451 P.2d 422]; and *People* v. *Hopper* (1969) 268 Cal.App.2d 774, 777, fn. 2 [75 Cal.Rptr. 253].) Here, however, there is more than a failure of memory.

After eliciting further testimony from the witness concerning the events of the evening, the prosecutor referred the witness to her testimony at the preliminary examination on July 19, 1968 in which she had revealed a confession made by the defendant.[3] The witness acknowledged that the questions and answers were recorded as made. Defendants' objection on the basis of *People* v. *Johnson* (1968) 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111] was overruled, apparently on the theory that in the instant case, as distinguished from *Johnson* where the prior testimony was elicited at a nonadversary grand jury proceeding, the defendant had an opportunity to confront and cross-examine the witness at the time the original testimony was given. *People* v. *Green* (1969) 70 Cal.2d 654 [75 Cal.Rptr. 782, 451 P.2d 422], although conceived, was almost seven months from accouchement.[4] *Johnson* itself indicated that the principles embodied in former Penal

The statements themselves are inconsistent, and the prior statements refer to some facts, e.g., the position of the child in the car while riding with the defendant and his wife, which were inconsistent with the wife's testimony. The statements would therefore be admissible under proper instructions, to impeach the witness. (See, Evid. Code, § § 780, subd. (h) and 785; *People* v. *Spencer* (1969) 71 Cal.2d 933, 942 [80 Cal.Rptr. 99, 458 P.2d 43]; *People* v. *Neese* (1969) 272 Cal.App.2d 235, 238 [75 Cal.Rptr. 314]; and *People* v. *Alvarez* (1968) 268 Cal.App.2d 297, 303 [73 Cal. Rptr. 753].)

Moreover, where there is a failure of recollection the law still permits the good faith use of the prior statement for the purpose of refreshing the witness' recollection. If the witness affirms the truth of what was said and recorded, without presently remembering the facts to which he testifies, the statements may be received as past recollection recorded. (See Evid. Code, § 1237; *People* v. *Gentry* (1969) 270 Cal. App.2d 462, 468-471 [76 Cal.Rptr. 336]; *People* v. *York* (1966) 242 Cal.App.2d 560, 566 [51 Cal.Rptr. 661]; and *People* v. *Wojahn* (1959) 169 Cal.App.2d 135, 141-142 [337 P.2d 192].)

[3]This testimony subsequently read to the jury reads: "Question. All right. Now, Mrs. Jackson, at the time that Mr. Jackson and Kathleen returned to your home in Blue Lake was there some conversation between yourself and Mr. Jackson? Answer. Not in the home. We had left the home. Question. Where did this conversation take place? Answer. Approximately around the block from our place, around the grocery store, Doctor Laker's office and then home. Question. Was there a conversation in reference to Kathleen? Answer. Yes, there was. Question. What was that conversation? Answer. Well, he told—came back and told me what he supposedly was to have done. Question. What was said? Answer. In the exact words that he told it? Question. Yes, please. I'm sorry, but it's necessary. Answer. Well, he came back and tooted the horn in front of the house and I went out and got in the car, and we got down by the store and he said—he always calls me mom, he said, 'Mama, I broke Kathy's cherry,' and I was speechless. I looked at him and I said, 'You did what?' With sort of a blank look he repeated. I said, 'Do you realize what you're saying,' and he looked at me like he didn't even realize that he had talked to me, but that was about all."

[4]The Court of Appeal decision heralding the ultimate ruling was filed August 16,

Code section 686, subdivision 3, with reference to the opportunity to cross-examine the witness on the prior occasion (see Evid. Code, §§ 1290-1292) might be determinative on the issue of the use of the prior testimony. (See 68 Cal.2d at p. 653.) The testimony was offered and received as substantive evidence. Thereupon, it was read to the jury without comment as to its scope or effect.

The witness explained that she had given the prior testimony because on July 5, 1968 when she asked a detective in the sheriff's office, "What are we going to do when he goes to court?", the detective said, "You'll have to repeat this in court the same as you have told me here" referring to some notes he had made of what the witness was supposed to have told him at the hospital.

In explaining, she further volunteered, *"Mr. Jackson could have told me that, I do not remember whether he did or did not."* (Italics added. Cf. fn. 2, *supra.*)

She was then confronted with the reported statement made to the detective on July 5th.[5] At this point the defendant reopened his objection to the use of the testimony from the preliminary examination and alluded to the references to *Barber* v. *Page* (1968) 390 U.S. 719 [20 L.Ed.2d 255, 88 S.Ct. 1318] found in *People* v. *Johnson, supra,* 68 Cal.2d at p. 659, fn. 9; and see *People* v. *Green, supra,* 70 Cal.2d at pp. 659-661. The court adhered to its original ruling and then took up the question of the admissibility of the July 5th statement. In response to the defendant's objection predicated upon *People* v. *Johnson,* the prosecutor advised the court that her prior extrajudicial statements were offered for impeachment. Some

---

1968 (265 A.C.A. 1 (published September 10, 1968), 71 Cal.Rptr. 100), and the trial court on August 27, 1968 could not be charged with knowledge of that ruling.

[5]This statements reads: "Question. Where did you go? Answer. Well, we drove from our home, we drove by Doctor Zuleger's office and the store and then there is a scale on 299 just before you cut off to Korbel. Question. Uh huh. Answer. We turned down that road and passed—passed the Blue Lake Cemetery, and there's a road that cuts off from there and comes out right by our garage, and we came down there. Question. Was there any conversation while you were gone? Answer. Yes, there was. Would you tell us, please? Answer. I came out from the house and when I got in the car he told me he had an affair with my daughter. Question. Can you tell me the exact words he used? Answer. The way he described it? Question. Yes, Ma'am. Answer. Well, we got up there and he says, 'I've got something to tell you,' and I said, 'What,' and he said, 'I had an affair with Kathy,' and he said, 'I broke her cherry,' that's exactly what he told me. Question. Did he mention where this occurred? Answer. No, he didn't. Question. And Kathy was in the car at this time? Answer. Yes, she was. Question. Well, when you got in the car to go with them did Kathy slide over to the middle of the seat? Answer. That's where she was sitting when I came out of the house, was directly in the middle of the seat, and she never moved until her and I got out of the car after we came home."

confusion was manifest as to whether or not *Johnson* precluded the use of such prior inconsistent statements for impeachment, but the court ultimately permitted the prosecutor to interrogate the witness with reference to passages from that statement.

The witness acknowledged that she had read over the statement before taking the stand at the trial, and that a reporter took down the discussion which had evolved as follows: ". . . he [the detective] had a notebook apparently which was made up of statements that I was supposed to have said at the hospital, and we started discussing that." In response to a question as to whether she was told what to say, she testified as follows: "After he had gone down over the notes he wrote down, part of them seemed familiar and part did not, and I told him I'd never been in a courtroom and I said, 'What will happen,' and he said, 'You'll be asking the very same statement and apparently you'll be stating them the same way then as you stated today to me.' Q. Did he tell you what to say? A. He did not tell me in the exact words, no, he said we would be discussing what he had wrote down." She identified the passage referred to (fn. 5 above) as follows: "I recall of—of answering somewhat to that" but subsequently she stated, "I will not definitely say that's the way I answered for I do not remember."

On redirect examination she reiterated that she could or could not have made the statements attributed to her in the July 5th transcript—that she did not remember. She acknowledged that the detective did not tell her what to say at that time. When pressed concerning the question of whether the defendant did, as she had testified at the preliminary hearing, make a statement about what happened to the child she stated, "Now I—I won't say he did say it and I will not say that he did not say it. He could of or could have not, I don't recall whether he did or not." When again asked to explain her testimony at the preliminary hearing, she acknowledged that the prosecutor had told her to tell it as she understood it and not by what somebody else told her or advised her to do, but she reiterated that she then answered "The way that I understood the statements were down."

The prosecutor also proposed to introduce evidence of a statement, undisclosed, allegedly made to the victim's paternal aunt. The witness denied seeing or having a conversation with that individual on the night of the incident. When the aunt was called as a witness she testified that the defendant and his wife, unaccompanied by the child, came to her house on the night of June 30th and remained there for 45 minutes or an hour while the defendant repaired the car. The prosecutor was prevented from inquiring into statements made by the defendant's wife, which were allegedly inconsistent with her testimony, on the basis of a prior ruling of the court that they would be cumulative.

The wife acknowledged that she had seen the detective prior to July 5th. The detective testified that he saw that witness at the hospital and conversed with her, but was precluded from testifying as to alleged inconsistent statements made by her in that conversation by the same ruling as was applied to the testimony of the aunt.

The defendant's sole reference to the alleged conversation with his wife on direct examination was to state that he told her that the child "didn't feel good." He reiterated this testimony on cross-examination. He was asked the following question, ". . . Mr. Jackson, there's been testimony to the effect that you told your wife something to the effect that you had broken Kathy's cherry?" He answered, "I do not remember saying any such thing to my wife." This equivocal denial was followed by a more direct denial of a related question, as follows: "Q. . . . did you tell Mrs. Jackson that you had had an affair with Kathy?" to which he answered, "No, I did not."

In *People* v. *Johnson, supra,* 68 Cal.2d 646 (cert. den. (1969) 393 U.S. 1051 [21 L.Ed.2d 693, 89 S.Ct. 679]) the court ruled that the provisions of sections 1235 and 770 of the Evidence Code which purport to permit the prior inconsistent statement of a witness to be used as substantive evidence of the facts asserted in such statement are an unconstitutional infringement on the constitutional rights to be confronted with and to cross-examine a witness. (68 Cal.2d at p. 660. See also, *People* v. *Coleman* (1969) 71 Cal.2d 1159, 1164 [80 Cal.Rptr. 920, 459 P.2d 248]; *People* v. *Washington* (1969) 71 Cal.2d 1061, 1074-1075 [80 Cal.Rptr. 567, 458 P.2d 479]; *People* v. *Spencer* (1969) 71 Cal.2d 933, 939 [80 Cal.Rptr. 99, 458 P.2d 43]; *People* v. *Odom* (1969) 71 Cal.2d 709, 713-714 [78 Cal.Rptr. 873, 456 P.2d 145]; *People* v. *Graham* (1969) 71 Cal.2d 303, 323-324 [78 Cal.Rptr. 217, 455 P.2d 153]; *People* v. *Sam* (1969) 71 Cal.2d 194, 207 [77 Cal.Rptr. 804, 454 P.2d 700]; *People* v. *Mc-Gautha* (1969) 70 Cal.2d 770, 780 [76 Cal.Rptr. 434, 452 P.2d 650]; *People* v. *Green, supra,* 70 Cal.2d 654, 658-659; *People* v. *Bradford* (1969) 70 Cal.2d 333, 344-345 [74 Cal.Rptr. 726, 450 P.2d 46]; *People*

v. *Middleton* (1969) 276 Cal.App.2d 566, 571 [81 Cal.Rptr. 32]; *People* v. *Dilworth* (1969) 274 Cal.App.2d 27, 36-37 [78 Cal.Rptr. 817]; *People* v. *Neese* (1969) 272 Cal.App.2d 235, 238 [77 Cal.Rptr. 314]; *People* v. *Miles* (1969) 272 Cal.App.2d 212, 221 [77 Cal.Rptr. 89]; *People* v. *Pierce* (1969) 269 Cal.App.2d 193, 200 [75 Cal.Rptr. 257]; *People* v. *Hopper* (1969) 268 Cal.App.2d 774, 776-777 [75 Cal.Rptr. 253].)

In *People* v. *Green, supra,* the court applied the rule of *People* v. *Johnson* to prior inconsistent statements elicited under oath and subject to cross-examination at a preliminary examination. The court ruled, "Therefore, cross-examination at trial on prior testimony, together with cross-examination at the time of the statement before a different trier of fact, is not a valid substitute for constitutionally adequate confrontation." (70 Cal.2d at p. 665.)[6]

"In the absence of a specific instruction expressly limiting the jury's use of the extrajudicial statements to impeachment, '[a]n assumption that the jury considered this evidence only to measure credibility would be unrealistic.' (*People* v. *Pierce* (1969) 269 Cal.App.2d 193, 203-204 [75 Cal.Rptr. 257]; accord: *People* v. *Vinson* (1969) 268 Cal.App.2d 672, 675

---

[6]The logic upon which this rule is predicated is not uniformly accepted. The court stated, "In summary, the rules that emerge from the cases and principles are these: cross-examination at trial relating to a statement or testimony given previously is constitutionally inadequate. (*Johnson.*) Cross-examination at the time of the 'statement, e.g., at a preliminary hearing, before a judge or agency other than the trier of fact charged with the ultimate determination of credibility and guilt, is likewise constitutionally inadequate. (*Barber.*) A combination of these two negatives obviously cannot produce a positive." (70 Cal.2d at pp. 664-665.) *Barber* says that prior cross-examination is inadequate where there is insufficient proof of present necessity. Since the testimony of the previously confronted and cross-examined witness is adequate when the witness is dead, or other adequate necessity is shown, the question is really one of whether the recantation provides adequate necessity for use of the prior statement. That there is such necessity in the case of a recantation induced by fear or other pressure is manifest. (See *People* v. *Pierce* (1969) 269 Cal.App.2d 193, 202-203 [75 Cal.Rptr. 257].) To this writer it is more logical and consistent with the administration of justice and pursuit of the truth to leave the question of what the presently confronted and examined witness actually perceived to the trier of fact after it has heard the conflicting testimony and the evidence concerning the circumstances under which it was given, including the witness' explanation of the discrepancy. (See the authorities collected in *People* v. *Johnson, supra,* 68 Cal.2d at pp. 654-655.) *Barber* does not require a contrary result unless the trier of fact rejects both statements. When it refuses to follow the subsequent testimony it is in effect giving credence to the earlier testimony.

and fn. 2 [74 Cal.Rptr. 340]; see also: *People* v. *Washington, supra,* 71 Cal.2d 1061, 1077; *People* v. *Spencer, supra,* 71 Cal.2d 933, 942-943; *People* v. *Graham, supra,* 71 Cal.2d 303, 324; and *People* v. *Hopper, supra,* 268 Cal.App.2d 774, 777.)" (*People* v. *Odom, supra,* 71 Cal.2d 709, 715.) The failure to instruct the jury that the use of statements was limited to impeachment was error. (*Id.,* p. 716. See also, *People* v. *Coleman, supra,* 71 Cal.2d 1159, 1164.)

■ General instructions such as given in this case (see CALJIC, Instruction No. 52 (Rev.) par. (g) and (h)), on the use of prior statements, inconsistent or consistent, for the purpose of evaluating the credibility of a witness do not suffice to cure the failure to give a limiting instruction. (See, *People* v. *Washington, supra,* 71 Cal.2d 1061, 1077; and *People* v. *Odom, supra,* 71 Cal.2d 709, 714, fn. 2; but cf. *People* v. *Dilworth, supra,* 274 Cal.App.2d 27, 36; *People* v. *Neese, supra,* 272 Cal.App.2d 235, 239; and *People* v. *Alvarez, supra,* 268 Cal.App.2d 297, 304-305.) Moreover, in this case at the request of both parties the court gave an instruction defining an admission (CALJIC, Instruction No. 29.1 (New)), and at the request of the defendant the cautionary instruction relating to admissions (*id.* 29-D (Re-rev.)). Since the only evidence of any extrajudicial statement of the defendant was the reference in the prior testimony and prior statement of his wife, the jury were in effect told to consider the prior statements as evidence.

■ In *People* v. *Odom, supra,* the court held that there was no waiver by failure to request a limiting instruction in cases tried prior to *People* v. *Johnson* (1968) (71 Cal.2d at p. 717, and fn. 5. See also, *People* v. *Neese, supra,* 272 Cal.App.2d 235, 238; and *People* v. *Vinson* (1969) 268 Cal.App.2d 672, 674-675 [74 Cal.Rptr. 340]. Cf. *People* v. *White* (1958) 50 Cal.2d 428, 430-431 [325 P.2d 985].) In this case, because of the trial court's earlier ruling, the request would have been futile with respect to the statements incorporated in the testimony

from the preliminary examination. It might well have been requested and given, however, in connection with the statements made to the detective.

In *People* v. *Johnson, supra,* the court ruled, ". . . we are dealing here with a witness' prior inconsistent statements, a category of evidence which may run the gamut from extremely damaging to trivial and insignificant. When such statements are introduced for their traditional purpose of impeaching the witness, they may have little effect on the guilt-determining process. Accordingly, the erroneous admission of such a statement as substantive evidence does not automatically deprive the defendant of a fair trial, and the conviction will be reversed only in those cases in which prejudice ensued." (68 Cal.2d at p. 660. See also, *People* v. *Coleman, supra,* 71 Cal.2d 1159, 1165; *People* v. *Washington, supra,* 71 Cal.2d 1061, 1077; *People* v. *Spencer, supra,* 71 Cal.2d 933, 943; *People* v. *Odom, supra,* 71 Cal.2d 709, 718; *People* v. *Graham, supra,* 71 Cal.2d 303, 325; *People* v. *Sam, supra,* 71 Cal.2d 194, 207; *People* v. *Neese, supra,* 272 Cal.App.2d 235, 238-239; and *People* v. *Hopper, supra,* 268 Cal. App.2d 774, 778.)

In *Johnson* the court concluded, ". . . we find the People have not proved that the substantive use of the prior inconsistent statements here challenged was 'harmless beyond a reasonable doubt.' (*Id.* at p. 24 . . .) Indeed, a clearer case of prejudice could not be imagined, for these statements constituted the sole evidence that an act of intercourse had taken place as charged. [Fn. omitted.] Not surprisingly, it appears from the face of the record that the People's case presented considerable difficulty to the jury: They consumed many hours in deliberations, called for the transcripts of the grand jury testimony, and returned to the courtroom a number of times, evenly deadlocked, before they were able to reach a verdict. That the jury thus hesitated to convict a man of a serious crime on out-of-court testimony of this nature is a credit to their prudence and good sense." (*Id.* at pp. 660-661. See also, *People* v. *Coleman, supra,* 71 Cal.2d 1159, 1165; *People* v. *Spencer, supra,* 71 Cal.2d 933, 943-944; *People* v. *Odom, supra,* 71 Cal.2d 709, 717-718; *People* v. *Graham, supra,*

71 Cal.2d 303, 325, 326; *People* v. *Sam, supra,* 71 Cal.2d 194, 207-208; *People* v. *Green, supra,* 70 Cal.2d 654, 665; Thompson, J. dissenting, *People* v. *Neese, supra,* 272 Cal.App.2d 235, 249-251; *People* v. *Miles, supra,* 272 Cal.App.2d 212, 221; *People* v. *Pierce, supra,* 269 Cal.App.2d 193, 204; *People* v. *Hopper, supra,* 268 Cal.App.2d 774, 778-779; and *People* v. *Vinson, supra,* 268 Cal.App.2d 672, 678; and cf. *People* v. *Washington, supra,* 71 Cal.2d 1061, 1077; *People* v. *McGautha, supra,* 70 Cal.2d 770, 780-782; *People* v. *Bradford, supra,* 70 Cal.2d 333, 334; *People* v. *Middleton, supra,* 276 Cal.App.2d 566, 573-574; *People* v. *Dilworth, supra,* 274 Cal.App.2d 27, 37; *People* v. *Neese, supra,* 272 Cal. App.2d 235, 239-241; and *People* v. *Gentry* (1969) 270 Cal.App.2d 462, 474-476 [76 Cal.Rptr. 336].)

*Other Evidence*

Since the determination of prejudice necessitates a review of all of the evidence, it is summarized as follows:

The victim, who was born December 1959, was 8 years old at the time of the incident, June 30, 1968, and when the defendant was tried, August 26th through 28th, 1968. Her mother testified that she had been under a doctor's care as a mental child under 3 years old and that she had never been to school. According to the surgeon who attended her following the alleged rape, she had had encephalitis and was mentally retarded. She did not respond to her mother's inquiry as to what was wrong when her mother first discovered the condition giving rise to the present charge, and when called as a witness by the defendant she stated, "I don't have nothing to say" and gave no oral answers other than to state her correct age.

She made her home in a household consisting of herself, her mother, her stepfather, the defendant, who had married her mother some two years before, on August 8, 1966, and a family friend who had lived with the

Jacksons for two or two and one-half months in Watsonville where the family were living in February 1968, accompanied them when they moved to Redding and when they subsequently established residence in Blue Lake, Humboldt County, only five days before the incident in question. He admittedly had been involved in a child molesting offense involving a boy in Modoc County in 1950, and had been institutionalized until August 1967.

On the Sunday on which the incident occurred the defendant's sister and mother-in-law came to visit between 1:30 and 3 o'clock in the afternoon. During this period the victim had gone off on several occasions to the store or to play with some friends. Thereafter, the three adults and the victim all went down to the Mad River fishing, and then returned home where they remained, with the exception of a possible trip to the store by the defendant and his wife, until the victim and her stepfather went off in the family car between 8:30 and 9 p.m. They returned about 9:25 or 9:30 and picked up the mother. The three then drove around Blue Lake for about a half an hour. During this ride the defendant complained of being sick and his wife took over the driving. The victim who had been sitting over close to the defendant, then crawled into her stepfather's lap and remained there until they all returned home between 9:30 and 10 p.m.

According to the mother, the victim who had complained to her father about her stomach during the earlier ride, bounced into the house as she always did and was acting normally. The defendant drove off about five or ten minutes later. The mother laid out the victim's night clothes and prepared to put her to bed. She observed some blood spots on her panties. On bathing the victim the mother noticed that the bath water looked somewhat red as if the child were bleeding. When she dried off the child there was no further bleeding but she found that the tissue was torn between the front part of the victim and her rectum.

The mother then put the child to bed in the bed in the living room where she customarily slept, left her there with the friend in the house, and drove off again with the defendant who had returned home in the meantime. They had no particular destination. The defendant took some tools from the house to work on the car. About 12:15 a.m. the defendant's car was observed moving unusually slow and weaving from across the center line to the shoulder of the highway as it came off a side highway onto Highway 101. He was stopped and arrested for drunk driving. At the time the wife was attempting to quench a nosebleed, which had commenced a few minutes earlier, with a handkerchief which had been given her by the defendant, and they assertedly were on the way to a hospital for medical attention. The flow of blood apparently stopped before the officers finished subject-

ing the defendant to the coordination tests which culminated in his arrest.[7] The wife took over the operation of the automobile and it was pushed to a nearby service station by the officers' car.

According to the wife she was at the service station for about two hours before she returned home. She found the friend sleeping on the couch across the room from the victim's bed. The child asked her mother where the defendant was and why he had not returned home. The mother then noticed that the child had been bleeding, put towels under her, and changed her clothes. The record indicates that subsequently the mother and the friend brought the child to the hospital where remedial surgery was performed. She acknowledged that she talked to officers at the hospital when she brought her daughter in. A sheriff's deputy testified that he talked to the mother and the friend at the hospital in the early morning hours, 1:30 or 2:30 a.m., of July 1; and that thereafter accompanied by the friend and two other deputies he went to the defendant's residence and took some clothing and rags which appeared to be bloodstained.

A surgeon testified that he was summoned to the hospital at about 5:30 or 6 a.m. by another doctor. He found the child already anesthetized in a surgery suite. He observed that the crotch area was a mass of blood. After the patient was washed and scrubbed, he found the following pathological condition, "The lower end of the anus and rectum were protruding due to the fact that the sphincter or bit of muscle that closes the exit of the large bowel had been torn, and there was bulging of the rectal wall forward, and this could be followed interiorly because the posterior or the back wall of the vagina was ripped open and extended all the way almost to the very top." He opined that the injury could have occurred within the previous 8 or 10 hours, at least within 24 hours; that the tearing was caused by a blunt object about an inch or an inch and one-half in diameter, or of equivalent size if not round, which was inserted to a length of from two to three inches; that the injury would have been accompanied by a spurting of blood initially and profuse hemorrhaging until clotting occurred or the bleeding was stopped by the application of pressure; and that clotting would occur in from approximately three to ten minutes. He also stated that in his opinion the child would have suffered pain and voluntary curtailment of movement, but that he could not tell whether this child was normal in her body reactions because of her mental retardation.

The surgeon spent an hour and five minutes sewing up four and one-half to five inches of the child's vagina and rectum in what was the equivalent of the repair of third degree peroneal lacerations. The child was confined to

---

[7]The defendant testified that he pleaded guilty to the drunk driving charge and was sentenced to five days and a $400 fine.

the hospital for 15 days recuperating. The doctor concluded that he was not in a position to state that the injury was occasioned by some object other than a male organ, that the wound was clean and there was no debris to suggest some foreign physical matter; and that he could hardly think and would have to stretch his imagination to conclude that the child would have inflicted such an injury on herself.

The defendant's testimony was consistent with the sequence of events prior to his arrest as related above. He denied knowledge of anything wrong with his stepdaughter except that she complained she did not feel good when they were on the drive together, and that he returned home at her request. He denied that he did anything to her while they together alone. He was unable to explain how blood got on his clothing, or why he did not take the child into the house when they first returned home, but instead drove off again with her mother. He testified that he shared a six-pack of beer with the lodger prior to the going off with the child, and that later prior to his arrest he had consumed two cans out of a second six-pack of beer which he had purchased on that trip.

The friend confirmed the activities of the day. He testified that the mother pointed out the child's injuries to him as she was putting her to bed, and that he observed she was bleeding a little. He conversed with the mother about the child's condition. After the couple left between 10 and 10:30 he watched television until a little after 11 and went to sleep until he was aroused when the child's mother returned. He denied having anything to do with causing or creating the child's condition.

The prosecution also offered the testimony of a convicted second-degree murderer, who was still serving time in a state conservation camp, to show the defendant's actions in relation to his stepdaughter, and statements made by the defendant concerning the relationship between himself and his stepdaughter. These observations were made by the witness during a period from July or August through October or November 1967 while the witness and the defendant were both imprisoned at Soledad State Prison and shared common visiting periods. He described observing activities which were consistent with the defendant's fondling the child improperly while she sat in his lap, and further testified to four conversations in which the defendant indicated that he was so conducting himself with the child, and made other statements which indicated he would fabricate a defense of intoxication if caught molesting his stepchild. The defendant and his wife expressly repudiated this testimony, although acknowledging an acquaintance with the witness and his wife. The witness was also impeached by showing a motivation to curry favor with the authorities and by showing grounds for animosity toward the defendant.

The jury was also presented with physical evidence consisting of the handkerchief used by the wife to quench her nosebleed; the clothing from the house which the wife identified as three pairs of underpants and a pajama bottom which the child had worn on the night in question (the wife acknowledged she had changed the child several times when she last returned to the house); the clothes taken from the defendant at the county jail following his arrest, samples of the bloodstained seat and floor mat from the defendant's car, and photographs of the interior of the car.

The testimony reflects that there were stains on the fly area of defendant's trousers and shorts. A laboratory technician from the Federal Bureau of Investigation testified that he found smeared human blood on the front and fly area of the defendant's trousers—within the zipper and on the outside of the fly area. Human blood was also found in the fly area of the defendant's shorts and on his tee shirt. He also found human blood on the specimen cut from the car seat and the floor mat, and on the articles of clothing removed from the house. He was unable to type the blood found on the defendant's clothing and on one of the seat samples, but the other articles revealed Type O blood. No evidence of semen was found in tests made of the foregoing specimens. The testimony of a second technician revealed that both the mother and child had Type O blood, and that the defendant's blood was of Type A. He further testified that a test of blood drawn from the defendant at 12:45 a.m. on July 1, 1968 revealed a blood alcohol content of 2.37 miligrams per cc. of blood; and that at that time he appeared to be under the influence of alcohol. Specimens taken from the victim at 5:30 a.m. on July 1st were too bloody to permit a visual examination for sperm, but tested negative for semen in a chemical test.

The defendant testified that on one occasion in February 1968 he had observed the child playing with herself. His wife testified that her daughter had come to her several times with a couple of spots of blood on her panties and had wanted to know what it was from; and that on other occasions she had observed her using the mother's instruments of personal hygiene. She added that one reason they had left Watsonville was because of the child's actions toward other little children in the neighborhood. The defendant's mother testified that while the child and her parents were staying with her, on a couple of occasions she had observed the child lying on her back in the yard with her legs in the air, and her hand within her panties playing with her bottom. She never saw her with anything in her hands, nor did she ever observe any bleeding. A friend who had known the mother for many years, most all of the child's life, stated that over a period of time she had seen the child digging, picking and scratching at herself on the outside four or five times, and that on one occasion she had a stick up inside of herself.

*Prejudice*

 In the instant case the surgeon's testimony supplies the lacuna of proof noted in *Johnson*. It demonstrates not only that the injuries were consistent with a sexual attack, but also that it was beyond comprehension that the injuries could have been self-inflicted. The evidence covers the child's activities during the course of the day. If she had injured herself accidently, or even intentionally, in those brief intervals in which she was not with adult members of her family, the resultant bleeding, according to the surgeon, would have become immediately evident. It is impossible to reconcile the proved circumstances with any other rational conclusion than that the child suffered her injuries while she was on the drive with the defendant. (See CALJIC, Instruction No. 26 (Rev.).)

The blood in the car qualitatively could have come from the mother's subsequent nosebleed. Quantitatively, however, the description of the blood found in the car cannot be explained by the evidence concerning the nature and extent of the mother's nosebleed.[8] Nor is there any explanation, other than injury to the child for the blood on the defendant's clothing.[9]

Nor do the suspicions engendered by the lodger's prior record warrant questioning the conclusion established by the other circumstances. It is clear from the record that the injuries suffered by the child were incurred prior to the time she was left alone with that witness. If his testimony that he did

---

[8]The arresting highway patrol officer testified that when he stopped the defendant the latter stated that he had not been paying attention to the road because his wife had a nosebleed and he was taking her to the hospital. The officer did not see any particular amount of problem with the lady who was sitting on the passenger side. He observed that she had a handkerchief up to her nose and that there was a small amount of blood on it and on her face. He did not see any dripping blood of any kind, and the nose had stopped bleeding before they left the scene.

The wife testified that on the drive immediately preceding the defendant's arrest she developed hemorrhaging due to a nosebleed; and that the defendant reached in his pocket, handed her a handkerchief, and started for the hospital. According to her, she first felt something warm drop on her, noticed the blood coming and got some on her white sweater, her dress and on one hand. She took the handkerchief offered by her husband and used it continually for approximately five minutes when the blood began to start clotting. She stated she got no more than a spoonful of blood on the front of her dress. She could not tell whether she got blood on any area in the car, but opined that with the wind blowing in the open window she could have gotten blood on the door paneling on the right side since she was facing in that direction.

The other evidence indicated that blood had been caked on the floor mat. The smeared blood on the seat suggested that attempts had been made to wipe it off.

[9]The record shows: "Q. There's been testimony that you have—there's been testimony that you heard concerning there being blood on your pants, trousers and tee shirt. Could you give us an explanation as to how this material got on your clothing? A. No, I can't"; and "Q. And while Mrs. Jackson was driving, Kathy sat on your lap? A. Yes. Q. Did you notice her bleeding at that point? A. No, I did not."

not molest the child were disbelieved, and the jury were permitted to speculate as to his conduct, it could only find that two offenses, rather than one, were committed.

The following statement from *People* v. *Gentry, supra,* is pertinent, "It is pointed out that the jury in this case deliberated for eight hours. That merely indicates a conscientious jury carefully considering a complicated factual situation. (We have pondered over the record a great many more days than the jury did hours.)" (270 Cal.App.2d at p. 475.) Here the jury commenced its deliberations. at 3:01 p.m. and returned a verdict eight hours later. During this period the jury requested and were given the physical exhibits. After deliberating two hours the foreman requested and was denied a reading of the portion of the prosecutor's argument in which the prosecutor had indicated a preference as to the charge of which the defendant should be found guilty, i.e., Penal Code section 261, subdivision 1 or section 288 (see fn. 1, above). A request for the testimony of the wife, and the testimony of the technician who examined the bloodstains on the defendant's clothing was granted, and this testimony was read to the jurors.

A review of the record convinces the reader that there has been no miscarriage of justice in this matter. ■ Nevertheless, "[T]he rule of harmlessness beyond a reasonable doubt requires reversal if examination of the entire record reveals a reasonable possibility that the error substantially influenced the conviction. [Citation.]" (*People* v. *Hopper, supra,* 268 Cal. App.2d 774, 778.) ■ In the application of this test the decision of this court is controlled by the rule that the use of improper evidence of a confession results in a denial of due process of law and requires reversal regardless of other evidence of guilt. (*People* v. *Price* (1965) 63 Cal.2d 370, 377 [46 Cal.Rptr. 775, 406 P.2d 55]; *People* v. *Janssen* (1965) 238 Cal.App.2d 106, 111-112 [47 Cal.Rptr. 453]; *People* v. *Benavidez* (1965) 233 Cal. App.2d 303, 307 [43 Cal.Rptr. 577] [overruled on other grounds, 66 Cal. 2d 1005]; and see *People* v. *Forbs* (1965) 62 Cal.2d 847, 851-852 [44 Cal.Rptr. 753, 402 P.2d 825].) ■ The opinion that another jury, correctly instructed as to the use of the impeaching material[10] would probably arrive at the same verdict is immaterial.

---

[10]No opinion is expressed as to the use of other statements which the wife may have made to her sister-in-law, to the lodger, or to any of the officers at the hospital because no offer of proof was made as to their content. It cannot, therefore, be determined whether any of them were inconsistent with her testimony at the prior trial, much less, with such testimony as she might give at a future trial, or whether they may be used in a good faith effort to refresh her recollection (see fn. 2 above).

*Use of Defendant's Clothing*

Defendant's clothing was taken from him as a routine matter when he was jailed following his arrest for driving while under the influence of intoxicating liquor. It was placed in a sterilizer, but was apparently removed at an early hour in the morning before it had been processed. The results of tests made on the clothes have been recounted above.

 Defendant equates the seizure of his clothes with the search of an impounded automobile. (See *Preston* v. *United States* (1964) 376 U.S. 364 [11 L.Ed.2d 777, 84 S.Ct. 881]; and *People* v. *Burke* (1964) 61 Cal.2d 575 [39 Cal.Rptr. 531, 394 P.2d 67]; but cf. *Cooper* v. *California* (1967) 386 U.S. 58 [17 L.Ed.2d 730, 87 S.Ct. 788], and *People* v. *Webb* (1967) 66 Cal.2d 107 [56 Cal.Rptr. 902, 424 P.2d 342, 19 A.L.R.3d 708].) At the outset he is met with the fact that he failed to object to the use of the clothing at the trial. (Evid. Code, § 353, subd. (a); *People* v. *Flores* (1968) 68 Cal.2d 563, 567 [68 Cal.Rptr. 161, 440 P.2d 233]; *People* v. *Ross* (1967) 67 Cal.2d 64, 71 [60 Cal.Rptr. 254, 429 P.2d 606]; Witkin, Cal. Evidence (1966) § 1285, p. 118.)[11]

 In any event, ". . . it is plainly within the realm of police investigation to subject objects properly seized to scientific testing and examination (see *People* v. *Rogers* (1966) 241 Cal.App.2d 384, 388-390 . . .)" (*People* v. *Teale* (1969) 70 Cal.2d 497, 507 [75 Cal.Rptr. 172, 450 P.2d 564]; and see *People* v. *Ross, supra,* 67 Cal.2d 64, 70-71) The foregoing authorities also establish that the defendant's clothing was properly taken into custody at the time he was booked. There was no error in admitting the clothes and the results of the tests made thereon into evidence.

For errors involving the use of the witness' prior inconsistent statements, the judgment is reversed.

Molinari, P. J., and Elkington, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied March 25, 1970. McComb J., and Burke, J., were of the opinion that the petition should be granted.

---

[11]The defendant did object to the use of the physical objects seized at the victim's residence. The judge overruled the objection on the basis of testimony elicited from the officer who went to the home that the mother had authorized him to go there with the lodger, and the latter pointed out the articles to the officer.