Filed 8/6/14  In re D.M. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re D.M., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>D.M.,<br><br>Defendant and Appellant. | F068151<br><br>(Super. Ct. No. 13CEJ600508-1)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Gary R. Orozco, Judge.

Arthur Lee Bowie, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jeffrey A. White, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Levy, Acting P.J., Detjen, J. and Peña, J.

After a contested jurisdiction hearing, the juvenile court found true the allegations that D.M., a juvenile, possessed a concealable firearm (Pen. Code, § 29610; count 1) and possessed live ammunition (Pen. Code, § 29650; count 3). The court found not true the allegation that he discharged a firearm with gross negligence (Pen. Code, § 246.3, subd. (a); count 2). The court declared D.M. a ward of the court pursuant to Welfare and Institutions Code section 602. The court reduced count 1 to a misdemeanor and set D.M.'s maximum period of confinement as one year four months. On appeal, D.M. contends insufficient evidence supported the juvenile court's findings on counts 1 and 3. We disagree and affirm.

## FACTS

On June 9, 2013, at about 12:46 a.m., Officer Webb was patrolling in a marked patrol vehicle. As he drove northbound on Blackstone Avenue by a Pep Boys store, he noticed a group of three males walking through the parking lot. The group consisted of D.M., Marcus, and Demar. Officer Webb was about 15 or 20 yards from the males, who were standing together. D.M. and Marcus were next to each other and Demar was behind them. Officer Webb saw no one else in the area. The parking lot was illuminated with tall street lights in the lot, as well as city street lights and lighting along the building. When Officer Webb glanced a second time, he saw that D.M.'s hand was raised and holding a revolver. Officer Webb heard a shot fired. He observed that D.M. had a high-top afro hairstyle and was wearing a grey T-shirt. Marcus had a short afro and darker skin, was about the same height, and wore a red shirt and dark pants. Officer Webb did not see what happened to the firearm.

Once the males realized an officer was watching them, they all ran eastbound across Blackstone Avenue. D.M. and Demar continued running eastbound through the mall's parking lot. Marcus turned south and ran through the parking lot. Officer Webb decided to follow D.M. because he had seen him holding the gun. Officer Webb had no

2

doubt in his mind it was D.M. who had the gun.[1]  He followed D.M. in the patrol vehicle while broadcasting his location, direction of travel, and description of the suspects.  As D.M. and Demar ran across curbs and medians, Officer Webb tried to maintain visual contact as he drove over and around obstacles.  He had his headlights on D.M. and had a clear view of him and his facial features.  Officer Webb yelled at D.M. to stop.  When D.M. and Demar ran into an alley and turned into a breezeway between apartment buildings, Officer Webb was forced to get out of his vehicle.  He chased them as they ran inside an apartment building, then he stood outside, pacing back and forth from front to back, trying to ensure that no one left the building as he waited for additional officers.  When backup arrived, officers set up a perimeter and called everyone out of the building.  About seven people came out, including D.M. and Demar.  They were now wearing different clothes, but Officer Webb recognized them and still had no doubt D.M. was the one who had fired the gun.

A woman outside the apartments identified herself as a stepmother.  Officer Webb told her they had surrounded the building and asked everyone to come out because he had observed D.M. and Demar in the parking lot and D.M. was holding a firearm.  A woman who identified herself as D.M.'s grandmother stood next to D.M. while Officer Webb interviewed him.

Officer Webb arrested D.M. and read him his *Miranda*[2] rights.  D.M. agreed to speak.  He said Marcus was the one who had the firearm and shot it in the parking lot.

---

[1]     Officer Webb explained that D.M. and Marcus were standing close together and it was within the realm of possibility that Marcus was the one with the gun because humans can make mistakes, but Officer Webb was confident D.M. was the one with the gun and he chose to pursue and arrest D.M. for that reason.

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436.

3

D.M. admitted previously possessing the gun, about four days earlier, but he denied ever shooting it. He said he held the gun, but never fired it.[3]

Later, the firearm was found in the Pep Boys parking lot. It was a .38 Special revolver, loaded with multiple rounds, one of which was expended. Officer Webb recognized it as the same firearm that he observed and heard fired in the parking lot.

The surveillance video of the parking lot did not record the incident. It skipped certain periods of time and the manager had no explanation for the missing time.

**Defense Evidence**

Several of D.M.'s relatives were present outside the apartments that night. Some lived in the building and others were visiting. They testified as follows.

D.M.'s cousin, Heaven, heard Officer Webb asking D.M. about the other boy he saw shooting the gun, and then Officer Webb said he saw D.M. shooting the gun. D.M. told Officer Webb that he did not know the boy and had just met him. The officer said he saw D.M. with the gun. Heaven interrupted and said, "'Didn't you just say you seen the other guy with the gun?'" Officer Webb waved his hand at her as if she should step back.

D.M.'s cousin, Kashyra, heard Officer Webb say it was an older boy, not D.M., who shot the gun. She thought Officer Webb asked D.M. who the older boy was. She did not hear everything because she was about 15 feet away.

D.M.'s grandmother, Joyce, testified that D.M. had been living with her for about six months. That night, she approached when Officer Webb was speaking to D.M. Officer Webb told her she needed to step back, but she stayed to listen. D.M. was handcuffed. The officer asked D.M. who the tall, older boy was. D.M. said his name was Marcus. He said he did not know him well. Officer Webb said, "'I know you [and Demar] did not shoot the gun, but it was the older boy.'" Officer Webb asked, "'Did you ever hold a gun?'" D.M. answered, "'Yeah, I held a gun.'" He said, "'About 4 days

---

**3** We disagree with defendant's claim that "there is absolutely no evidence that the gun D.M. admitted to possessing is the same firearm alleged in the petition."

4

ago.'" Officer Webb told him, "'Oh, the reason why I'm asking you this [is] in case we check the gun and … it was in a crime, we know that you held it.'" Officer Webb said he saw who shot the gun and it was the older boy, not either of the two younger boys. Joyce was surprised the officers arrested D.M. because she thought they would let him go.

On cross-examination, Joyce testified that D.M. admitted to Officer Webb he had been with Marcus that night. D.M. told Officer Webb they were trying to scare off a man who had robbed a lady. He said the older boy was trying to scare the man off. But according to Joyce's prior statement to the defense investigator, D.M. said they were trying to scare the man off. Joyce heard D.M. admit to being in possession of a gun four days earlier.

D.M.'s father, Dana, was about 18 feet away when he overheard D.M. and Officer Webb speaking. Officer Webb said, "'Your buddy lied already. I saw you out running. I had a full description of you both. You ran across the parking lot. Um, I'm not saying that you was the shooter or anything, but who was the guy that had the gun? Who was the other tall guy you guys was with?'" Officer Webb said he saw everything and watched all three of them. He said, "'You're not the guy who did the shooting. He was older than the both of you. What was his name?'" D.M. said, "Marcus."

On cross-examination, Dana testified that he did not remember telling the defense investigator that the officer asked D.M. if he had touched the gun and D.M. told him he had not shot the gun but he had held it four days earlier. Dana did hear people talk about it, but he did not actually hear D.M. say that.

### Juvenile Court's Findings

After considering the evidence and argument by both counsel, the juvenile court found counts 1 and 3 true, and count 2 not true. The court did not discuss the basis for its findings at this time.

At the disposition hearing, defense counsel urged the juvenile court to consider reducing count 1 to a misdemeanor. Counsel added:

5

"This is his first time ever being in trouble with the law. I know there was some evidence of D.M.'s own admission of holding the gun four days prior to his arrest, which, you know, was described as—as momentary possession. And the Court did find it untrue as to the negligent discharge [count], so we are asking the Court to consider a reduction to a misdemeanor."

The People objected to the reduction, arguing as follows:

"We feel that the Court basically gave D.M. a break in the sense that [it] found Count 2 not true. He admitted to—I mean, at the very least, holding a gun, being in possession of a gun a couple of days prior to this incident. This was an incident where he was with two other individuals and that there was displaying of this weapon, because supposedly, if you believe his story, that … there was some problem going on between two other individuals in that parking lot. This minor ran from the police—he didn't just stop when he saw the officer, he ran into an apartment, changed clothes—I mean, there's just a lot of evidence that he was not necessarily cooperative with the officer when he was pursuing the minor and his friend after this incident happened."

The juvenile court responded:

"In reading and considering the disposition report and acknowledging, you know, the evidence that I heard and—I wouldn't characterize the Court's verdict as a break, just that's the Court's verdict that it rendered back on the date of the trial, or else a true finding might be interpreted as the opposite of a break. And I mean, if the court took it out on somebody—and I never do that, I base my decisions on the evidence before the court and the burden of proof that the court must consider. I just want the record to reflect that, and I know you didn't mean it that way, [Ms. Prosecutor], and I understand that.

"But looking at the minor's prior history, or a lack thereof, this was a very serious incident and, you know, he states to the officer the reasons why the firearm was fired and by his friend Marcus, who suddenly pulled it out as if he was surprised. I have my concerns whether or not he truly was surprised, given his own admission he held that same gun four days earlier, so it shouldn't have been a surprise, and the inference—the reasonable inference the Court can draw from such evidence is that, you know, Marcus, or somebody else showed him the gun, so he shouldn't have been surprised when the gun was drawn. And the theory upon which perhaps liability or culpability is found is based on the fact that he was with the person at the time and more than … merely standing by, but somehow assisting in the act that was committed that night. But in the Court's, you know, universe of dispositions involving minors, the nature of this offense,

6

what he's done in the way of school, having been raised by his grandmother, who, for the most part—you know, he's out late at night on this particular incident, the Court does not—does not appreciate, and has concern for that, that better care needs to be exercised with regard to—once he's 18 and once he's out—and I know how tough it is when they get to that age, and you have to listen to an adult, D.M. No matter what, they're still responsible for you, so you must listen to them. But continuing: He's in JE Young [Academic Center], mainstream, 11th grader, he's 17, and this is his first time before the court. The Court is going to exercise its discretion with regard to Count 1, the violation of Penal Code Section 29610, and reduce that to a misdemeanor, having, again, looked at the nature of the offense, the gravity, the lack of any history as to the minor, and how he's performed while living at home with his grandmother."

## DISCUSSION

### I.  Standard of Review

A juvenile appeal is subject to the same standards that govern adult criminal appeals. (*In re Muhammed C.* (2002) 95 Cal.App.4th 1325, 1328; *In re Roderick P.* (1972) 7 Cal.3d 801, 809.) "[T]he reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

"The standard of appellate review is the same in cases in which the People rely primarily on circumstantial evidence. [Citation.] Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible to two interpretations, one of which suggests guilt and the other innocence [citations], it is the [trier of fact], not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the

judgment.'" [Citations.] 'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.'" (*People v. Bean* (1988) 46 Cal.3d 919, 932-933.)

## II.  Possession of the Firearm and Ammunition

Penal Code section 29610 provides: "A minor shall not possess a pistol, revolver, or other firearm capable of being concealed upon the person." "Possession may be actual or constructive. Actual possession means the object is in the defendant's immediate possession or control. A defendant has actual possession when he himself has the weapon. Constructive possession means the object is not in the defendant's physical possession, but the defendant knowingly exercises control or the right to control the object." (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 831.) Thus, to establish constructive possession, the prosecution must prove the defendant knowingly exercised a right to control the firearm, either directly or through another person. (*People v. Pena* (1999) 74 Cal.App.4th 1078, 1083-1084; *People v. Mejia* (1999) 72 Cal.App.4th 1269, 1272.) Possession may be shared with others. (*People v. Neese* (1969) 272 Cal.App.2d 235, 245.) But mere proximity to the weapon, standing alone, is not sufficient evidence of possession. (*People v. Land* (1994) 30 Cal.App.4th 220, 223-224.) Possession can be shown by circumstantial evidence and may be inferred from the defendant's conduct. (*People v. Rushing* (1989) 209 Cal.App.3d 618, 622-623.)

In this case, the evidence was sufficient to support a finding that D.M. actually possessed the gun that night, raised it in his hand, and fired it. Officer Webb's testimony provided ample evidence. But the juvenile court's explanation establishes that it did not find this scenario true. The court explained that it based its findings on evidence that D.M. was "with the person at the time and more than … merely standing by, but somehow assisting in the act that was committed that night." And the court concluded that D.M.'s admitted possession of "the same gun" four days earlier supported the reasonable inference that he knew it was present that night and was not surprised when

8

his companion pulled it out.  This explanation and the court's not true finding on the negligent discharge count demonstrate that the court concluded D.M. did not fire the gun that night.  But, contrary to D.M.'s assertion, this does not mean that D.M. could not have possessed the firearm that night.

As we have explained, possession can be constructive.  Here, the circumstantial evidence supported findings that D.M. was familiar with the gun his companion was carrying that night.  D.M. admitted he had possessed it four days earlier.  It was reasonable to infer, as the court did, that D.M. knew a companion was carrying the gun that night and that D.M. was not merely in proximity to it, but had a right to control it and shared possession of it.  Thus, substantial evidence supported the juvenile court's finding that D.M. possessed the firearm.

For the same reasons, substantial evidence supported the juvenile court's finding that D.M. possessed the ammunition inside the firearm.  And the court reasonably inferred the ammunition was live because one of the rounds was fired that night (see *In re Khamphouy S*. (1993) 12 Cal.App.4th 1130, 1134-1135 [prosecutor must prove ammunition was live, i.e., capable of being fired or detonated from a firearm]).

## DISPOSITION

The juvenile court's orders are affirmed.